651 F.2d 615
 Fed. Sec. L. Rep. P 98,237
Clyde O. ARRINGTON and Joy M. Arrington,
Plaintiffs-Appellants and Cross- Appellees,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., a Delaware
corporation, and James Richie,
Defendants-Appellees and Cross-Appellants.
 Nos. 77-3911, 77-3924.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 3, 1980.
Decided Jan. 16, 1981.
 
 Ronald P. Arrington, Caldwell & Toms, Newport Beach, Cal., for arrington.
 Robert H. Edwards, MacDonald, Halsted & Laybourne, Los Angeles, Cal., for Lynch.
 Peter Brown Dolan, Overton, Lyman & Prince, Los Angeles, Cal., for defendants-appellees and cross-appellants.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE and SKOPIL, Circuit Judges, and EAST,* District Judge.
 The opinion filed in this case on November 3, 1980 is withdrawn. The attached Amended Opinion is ordered filed. The mandate shall issue forthwith. Counsel shall hereafter direct all correspondence through the Clerk of the Court in accordance with the rules of the United States Court of Appeals for the Ninth Circuit, Rule 1.
 AMENDED OPINION
 SKOPIL, Circuit Judge:
 
 INTRODUCTION
 
 1
 Plaintiffs lost a substantial amount of money in the stock market "crash" of 1974. They brought an action against their broker alleging securities fraud because they had been induced to convert their cash account into a margin account and invest in speculative stocks without being told the risks. After a bench trial, they were awarded damages. Plaintiffs appeal alleging error in the damages award. Defendants cross-appeal. They contest the finding of liability and the measure of damages employed.
 
 
 2
 We discover no error in the trial court's finding of liability, but remand for the inclusion of an additional element of damages.
 
 FACTS
 
 3
 What follows is a summary of the facts as found by the district court.
 
 
 4
 In early 1974, plaintiffs Clyde and Joy Arrington had recently sold a small family business and retired. They took the proceeds of the sale, approximately $280,000, from a certificate of deposit in which they had originally invested it and asked Merrill Lynch to buy Western Airlines stock for them. James Richie, an account executive at Merrill Lynch, opened an account for the Arringtons and purchased 20,000 shares of Western Airlines stock for them.
 
 
 5
 After the account was opened, Richie and Clyde Arrington (Arrington) spoke on the phone daily about the stock market. Richie told Arrington that Gulf Oil, Syntex, Monsanto, and Stone & Webster stock were good quality securities. Richie said that Merrill Lynch analysts in New York were predicting substantial near term (three to six month) gains in these stocks. Richie recommended that Arrington purchase stock in these four companies whenever the price appeared favorable. Merrill Lynch analysts had never made the predictions Richie represented.
 
 
 6
 In April 1974, Richie asked Arrington if he had ever purchased securities on margin. Arrington said no and asked what margin was. Richie told Arrington that Merrill Lynch would lend the Arringtons money to buy stocks and Merrill Lynch would carry the investment. Arrington told Richie he did not want to borrow money.
 
 
 7
 Richie explained that the interest charged on the margin loan would be the prime rate on the date of purchase plus 1%. Arrington asked what risk was involved in the arrangement. Richie responded that there was little risk, and repeated the nonexistent predictions of spectacular near term gains.
 
 
 8
 On April 22, 1974 Richie recommended to Arrington that he buy 2,000 shares of Gulf Oil at the current price of $22 per share. He falsely stated that in the opinion of Merrill Lynch's analysts this was a favorable price. In reliance on Richie's representations Arrington authorized Richie to convert the account to margin and purchase the stock.
 
 
 9
 During May and June of 1974, in reliance on Richie's statements and recommendations, Arrington authorized the purchase on margin of 1,500 shares of Syntex, 1,000 shares of Monsanto, and 1,000 shares of Stone & Webster.
 
 
 10
 Richie misrepresented to Arrington the risks of purchasing stocks on margin, the recommendations of Merrill Lynch analysts regarding the four stocks he was pushing, and the increased risks of large margin accounts in the market decline he knew was occurring.
 
 
 11
 On July 15, 1974 Arrington purchased an additional 1,000 shares of Western Airlines on margin. This purchase was made without any recommendation by Richie or anyone else at Merrill Lynch.
 
 
 12
 By August 1, 1974 the Arringtons' indebtedness in their margin account stood at $252,664 and interest charges had reached several thousand dollars per month. Arrington was following market reports in the newspaper and knew that prices for stock (including his) had fallen drastically. On August 23, 1974 Merrill Lynch mailed the Arringtons their first margin maintenance call. The Arringtons received it by August 26, 1974. By August 30, 1974 they received their second maintenance call. On September 3, 1974 they had received a third maintenance call and Arrington had talked to Richie who explained that Arrington had to either put up money or sell some stock in a three-to-one ratio to maintain the account.
 
 
 13
 The aggregate purchase price of the Gulf Oil, Syntex, Monsanto, and Stone & Webster shares bought on margin was $240,807. The market value of those shares on August 26, 1974 was $190,500.
 
 
 14
 In 1975 the Arringtons brought this action against Merrill Lynch and Richie for violations of the federal securities laws. After a bench trial the court found that the defendants had violated section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5 of the Securities and Exchange Commission. The court also found, however, that plaintiffs had broken the chain of causation of their damages by not selling their margined stocks on August 26, 1974, when they knew or should have known of the fraud committed by Richie. Plaintiffs had judgment in the amount of $53,820 plus pre-judgment interest from August 26, 1974. Plaintiffs appealed and defendants cross-appealed.
 
 DISCUSSION
 
 15
 A. The existence of a violation.
 
 
 16
 Merrill Lynch and Richie contend there was no violation of the securities laws on the facts of this case. They correctly point out that section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5 of the Securities and Exchange Commission proscribe the use of any deceptive or manipulative device only "in connection with the purchase or sales of any security." 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b-5. See also Mason v. Unkeless, 618 F.2d 597 (9th Cir. 1980). They assert that the fraud here was in connection with the method of financing the purchase of securities, not with the purchase itself.
 
 
 17
 The Supreme Court has said that section 10(b) is to be read flexibly. When there is a sale of a security and fraud "touches" the sale, there is redress under section 10(b). Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). It does not matter that the fraud is not of the "garden variety" associated with securities sales. Id.
 
 
 18
 Misrepresentation of the risks of buying securities on margin in a declining market is fraud "in connection with" the purchase of the securities. Furthermore, the trial court found that Richie misrepresented not only the risks of financing stock investment through a margin account, but also the recommendations of Merrill Lynch analysts as to the four stocks involved. Misrepresentations of these recommendations is directly "connected with" the sale of the securities. Both misrepresentations made up a scheme to induce Arrington to borrow money from Merrill Lynch to engage in commission-producing securities purchases through Merrill Lynch. The trial court therefore properly found fraud "in connection with" the sale of securities.
 
 
 19
 B. Materiality and scienter.
 
 
 20
 Defendants attack the trial court's findings concerning the materiality of Richie's misrepresentations, his scienter, and Arrington's reliance. Defendants say there was insufficient evidence to support the court's findings on these matters.
 
 
 21
 Questions of materiality, scienter, and reliance are mixed questions of law and fact, but ones involving assessments peculiarly within the province of the trier of fact. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). They are therefore reviewed under the "clearly erroneous" standard. F.R.Civ.P. 52(a). See Securities & Exchange Comm'n v. Mize, 615 F.2d 1046, 1053 (5th Cir. 1980); Keirnan v. Homeland, Inc., 611 F.2d 785 (9th Cir. 1980); Securities & Exchange Comm'n v. Arthur Young & Co., 590 F.2d 785, 788-89 (9th Cir. 1979); Nash v. Farmers New World Life Insurance Co., 570 F.2d 558, 561 & n.7 (6th Cir.), cert. denied, 439 U.S. 822, 99 S.Ct. 89, 58 L.Ed.2d 114 (1978); Rochez Bros., Inc. v. Rhoades, 491 F.2d 402, 408 (3rd Cir. 1974).
 
 
 22
 A finding is clearly erroneous only when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Thomas v. S.S. Santa Mercedes, 572 F.2d 1331, 1335 (9th Cir. 1978).
 
 
 23
 Defendants contend that Arrington's handling of his stock shows that he was not concerned with short-term investments. They say this means that any misrepresentations about the short-term performance of the four recommended stocks were immaterial. Arrington's treatment of his Western Airlines stock is not probative of his intentions to handle all of his stocks as intermediate term investments. This showing does not convince us that clear error was committed when the district court found that Richie's misrepresentations about the predicted short term performance of Gulf Oil, Syntex, Monsanto, and Stone & Webster stock were material.
 
 
 24
 Defendants also fail to persuade us that the trial court's finding of scienter was plainly wrong. Richie testified that he believed the course of action he was suggesting carried little risk, but he did not testify that Merrill Lynch analysts had made the predictions he "repeated" to Arrington, or that he correctly explained margin financing and its risks. It is irrelevant that Richie subjectively believed the Arringtons would profit from the transactions he suggested.
 
 
 25
 Defendants offer no plausible support for their argument that Arrington did not rely on Richie's misrepresentations. Even if Arrington was not misled by Richie's incorrect statements about interest on margin financing, the evidence clearly supports the trial court's finding that Arrington did rely on the misrepresentations about the risks of stock trading on margin and the predicted short-term performance of the four stocks.
 
 
 26
 None of the trial court's factual findings in support of its conclusion that defendants were liable is clearly erroneous.
 
 
 27
 C. Damages.
 
 
 28
 1. Time frame for damages.
 
 
 29
 This circuit applies ordinary causation and mitigation principles in 10b-5 cases. Plaintiffs' damages in a 10b-5 case are limited by what they would have realized had they acted to preserve their assets or rights when they first learned of the fraud or had reason to know of it. They cannot recover that part of their loss caused by their own failure, once they had reason to know of the wrongdoing, to take reasonable steps to avoid further harm. Foster v. Financial Technology Inc., 517 F.2d 1068, 1072 (9th Cir. 1975). The trial court found that Arrington knew or should have known of defendants' fraud on August 26, 1974.
 
 
 30
 Defendants argue that the trial court should have cut off damages as of August 9, 1974. They choose that date because the court found that by August 1, 1974 Arrington realized that Richie's promises of substantial short term gains on the Gulf Oil, Syntex, Monsanto, and Stone & Webster stocks were not going to materialize.
 
 
 31
 This argument overlooks a significant part of the misrepresentation the trial court found defendants had made. Richie failed to tell Arrington about the multiplier effect margin financing has on a trader's losses in a declining market. There is nothing in the record before us to indicate that Arrington became aware of this fact before Merrill Lynch sent the Arringtons their first margin maintenance call.
 
 
 32
 Similarly, plaintiffs have not shown why the cut-off date chosen by the district court is clearly erroneous and should have been later. Even assuming the defendants perpetuated their fraud with false assurances of a rebounding market, the nature of the danger of holding securities on margin in a declining market must have become apparent when plaintiffs received their first maintenance call. The choice of August 26 as the cut-off date for plaintiffs' damages is not clearly erroneous.
 
 
 33
 2. Measure of damages.
 
 
 34
 Plaintiffs contend the trial court awarded them too little in damages. They argue they are entitled to recover all of the losses suffered in their account, with no deduction for losses attributable to general market decline.
 
 
 35
 It is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance. Blackie v. Barrack, 524 F.2d 891, 909 (9th Cir. 1975), cert. denied, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The court's function is to fashion the remedy best suited to the harm. Nye v. Blyth, Eastman, Dillon & Co., 588 F.2d 1189, 1198 (8th Cir. 1978); Garnatz v. Stifel, Nicolaus & Co., 559 F.2d 1357, 1360 (8th Cir. 1977), cert. denied, 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978).
 
 
 36
 The general rule allows plaintiffs defrauded in violation of section 10(b) and rule 10b-5 to recover the difference between the value of the consideration they gave and the value of the security they received, plus consequential damages that can be proved with reasonable certainty to have resulted from the fraud. Foster, supra, 517 F.2d 1068, 1071. Nevertheless, it is within the discretion of the district judge in appropriate circumstances to apply a recissory measure. Id.
 
 
 37
 The trial court determined that had plaintiffs sold their Gulf Oil, Monsanto, Syntex, and Stone & Webster stocks on August 26, 1974, when they knew of the fraud, they would have suffered damages in the amount of $53,820. The court arrived at this sum by imputing a sale of the stocks on August 26, 1974 for a price of $190,500 and subtracting that figure from plaintiffs' margin debt on that date ($255,286). The court then subtracted from the subtotal $10,966, which is that part of the margin debt attributed to the cost of the 1,000 shares of Western Airlines purchased on margin in July. The trial court attempted by this calculation to compensate plaintiffs for the debt they incurred because of the fraudulently induced purchases on margin.
 
 
 38
 The trial court's goal in measuring the damages is an appropriate one, and was met by the calculations it employed, except for the element of cash dividends. The measure served to compensate plaintiffs for the difference between their actual financial position on August 26, 1974 and the position they would have been in on that date had there been no fraud.
 
 
 39
 The court below found two distinct types of misrepresentations that acted together as to most of the stock purchases to injure the Arringtons. One set of misrepresentations concerned the risks of stock trading on margin. The other dealt with the predicted short-term performance of certain stocks. Only the first kind of misrepresentation was involved in the Arringtons' purchase of Western Airlines stock on margin. The district court found that absent any fraud the Arringtons would have purchased an additional 1,000 shares of Western Airlines stock, but not on margin. This finding is not clearly erroneous.
 
 
 40
 If there had been no fraud, on August 26, 1974 plaintiffs would have owned 21,000 shares of Western Airlines stock worth $173,250. Nevertheless, they would also have paid $10,966 to buy in cash the Western Airlines stock they bought on margin. This would have left them with a balance of $162,284. Instead, they owned stock worth $363,750, but owed Merrill Lynch $255,286, for a balance of $108,464. The difference between what they had on August 26, 1974, and what they would have had if there had been no fraud is $53,820.
 
 
 41
 The trial court's only error was in its treatment of the dividend activity in plaintiffs' account. Defendants now concede that the $2,000 in cash dividends paid on the Western Airlines stock went only to reduce the fraudulently-induced margin debt. Therefore these dividends should be included in the damages. Despite defendants' apparent late concession, plaintiffs are not entitled to credit for the cash dividends paid on the other four stocks and applied against the margin debt. Had there been no fraud, plaintiffs would not have owned the stocks, and hence would not have received the dividends. Since the dividends were applied against the margin debt, they are already accounted for in the damage calculation. The Western Airlines dividends are treated differently because plaintiffs would have earned them had there been no fraud, and there would have been no debt to consume them.
 
 
 42
 Plaintiffs' proposed damage formula would allow them to recover for the losses they suffered as a result of the market decline in their Western Airlines stock. They have shown no causal connection between defendants' fraud and this decline. Furthermore, plaintiffs' formula would compensate them twice for the interest accrued on the margin debt, since these charges were simply added to the debt. They are already included in the "losses" to which plaintiffs would add them. We therefore reject their measure of damages.
 
 
 43
 The judgment is AFFIRMED as to liability, REVERSED as to the amount of damages, and REMANDED for recalculation of the proper damage award.
 
 
 
 *
 The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation