**Louis G. BISSELL, Jr., on behalf of himself and all others similarly situated, Plaintiff,**

**v.**

**MERRILL LYNCH & CO., INC., and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Defendants.**

No. 93 Civ. 8243 (AGS).

United States District Court, S.D. New York.

Aug. 8, 1996.

Roger W. Kirby, Irving Malchman, Kaufman Malchman Kirby & Squire and Henry P. Monaghan, New York City, for plaintiff.

Henry F. Minnerop and Laurel J. Southworth, Brown & Wood, New York City, for defendants.

## OPINION AND ORDER

SCHWARTZ, District Judge:

This matter is before the Court upon the motion of defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated (collectively, "MLPF & S") to dismiss all claims alleged in the Second Amended Class Action Complaint (the "Complaint") under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, and the motion of plaintiff Louis G. Bissell, Jr. ("Bissell" or "plaintiff") for class certification. For the reasons set forth below, MLPF & S's motion is granted, and Bissell's motion is denied as moot.

## BACKGROUND [1]

In this putative class action brought under the federal securities laws and New York statutory and common law, plaintiff seeks damages relating to short sales in his stock brokerage account with defendant MLPF & S. Plaintiff does not allege that MLPF & S deprived him of any investment gains, nor does he seek to hold MLPF & S responsible for any investment losses. Rather, plaintiff asserts that he and the putative class are entitled to all of the "interest, other profits or economic benefits earned [by MLPF & S] on ... [customers'] property pledged as collateral in connection with such short sales...." Complaint ¶ 5.

Plaintiff asserts his claims not under any provisions of federal law specifically regulating short sales and the use of customer collateral [2], but under (1) general principles of section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78a *et seq.*, and Securities and Exchange Commission ("SEC") Rules 10b–5 and 10b–16, 17 C.F.R. §§ 240.10b–5 and 240.10b–16, (2) the common law of the State of New York, and (3) provisions of the Uniform Commercial Code.

Bissell opened a margin account with MLPF & S in 1981. Upon becoming a mar-

---

**1.** The facts alleged in the Complaint are taken as true for the purposes of this motion to dismiss. Facts recited below are derived from the Complaint and from documents to which the Complaint specifically refers, namely, plaintiff's monthly account statements and margin agreement with MLPF & S. Reference to such documents is permitted on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992) (Court may consider documents neither incorporated by reference nor attached to the complaint where the plaintiff "had ... [the documents] either in its possession or had knowledge of ... [them] and upon which [documents] they relied in bringing suit.")

**2.** Although aspects of short sales are regulated by both the SEC and the Federal Reserve Board, no federal law or regulation specifically requires the payment of interest, other profits or economic benefits earned by brokers on customers' property pledged as collateral in connection with short sales. As the SEC staff has stated:

> Inasmuch as no NYSE or Commission rule prohibits or explicitly mandates the payment of interest on customer credit balances and monies generated from the lending of customer securities, the payment of such interest is a matter for negotiation between the customer and the broker-dealer.

Singer (Interest to the Client of Short Sales), SEC No–Action Letter, 1979 SEC No–Act LEXIS 3284, at *1 (August 12, 1979).

gin customer, Bissell signed MLPF & S's standard margin agreement. In January 1983 Bissell deposited 16,000 shares of common stock of E.I. DuPont de Nemours & Company ("DuPont") into his margin account at MLPF & S, and in 1985 he commenced the practice of selling DuPont short.

Some background on the mechanics and regulation of short sales is necessary to put plaintiff's claims in perspective. In a short sale transaction the customer borrows stock to sell, is credited with the proceeds, and then restores the borrowed stock by purchase, hopefully at a lower price. Thus, a short sale is the sale of a security that the seller does not own, or, if he or she owns it, does not deliver to the buyer. Where the seller owns the security but does not deliver it to the buyer, the transaction is referred to as a "short sale against the box." [3] The monthly statements in Bissell's account reflect that all of Bissell's short sales were short sales against the box.

To secure the loan of stock, a short-selling customer is required to provide his or her broker with collateral in the form of cash or securities. In a "regular" short sale (as opposed to a short sale against the box), the collateral for the security loan usually takes the form of the cash proceeds received from the short sale, but securities may be substituted as collateral.[4] Whether in the form of cash or securities, however, SEC rules permit the broker-dealer to use the collateral to finance margin loans or security loans for the same or other margin customers. *See, e.g.,* 17 C.F.R. § 240.15c3–3.

In short sales against the box, the seller's collateral for the security loan always takes the form of securities, namely, the seller's own long security position "in the box." The cash proceeds from the short sale do not serve as collateral for the security loan in a short sale against the box.[5] To protect the integrity of the short sale against the box (*i.e.*, to assure that the long position is not delivered to the buyer), the broker-dealer segregates the seller's long position, thereby removing it from the pool of margin securities otherwise available to it for lending, pledging, hypothecation or any other purpose.

The broker obtains the stock that it loans to the customer from its own reserves or by borrowing it from other brokers or other customers, as permitted by standard margin agreements and applicable regulations. *See* 15 U.S.C. § 78h(c); 17 C.F.R. § 240.15c3–3(a)(3) and (4). When the broker borrows the stock from external sources, the broker must secure the loan with collateral worth at least 100 percent of the market value of the securities borrowed. Regulation T, 12 C.F.R. § 220.16. The funds used to secure the loan of stock may be taken directly or indirectly from the account of the customer engaging in the short sale, and typically are generated by the short sale itself.

Where the broker has provided collateral to another broker or institution to secure the

---

3. The rationale for short sales against the box is usually to speculate on the short-term decline of the "shorted" stock while continuing to hold the long position for long-term appreciation, or to defer capital gains taxes (as permitted by the Internal Revenue Code).

4. Regulation T of the Federal Reserve Board requires that all short sales be made in a margin account because a short sale, whether a regular short sale or a short sale against the box, involves the collateralized loan of securities on which the broker may charge interest. *See* Regulation T, 12 C.F.R. § 220.4(a). For regular short sales of nonexempt securities, Regulation T requires that customers meet an initial margin requirement of 150 percent of the market value of the security being sold. *See* 12 C.F.R. § 220.18(c). The New York Stock Exchange ("NYSE") imposes separate maintenance margin requirements for short sales. *See* NYSE Rule

431(c); *see also* Regulation T, 12 C.F.R. § 220.1(b)(2) (permitting exchanges to impose margin requirements above those set by the Federal Reserve Board).

5. While there is no initial margin requirement under Regulation T for short sales against the box, the NYSE does impose a maintenance margin requirement on short sales against the box of no less than 5 percent. *See* NYSE Rule 431(e)(1). NYSE member firms are free to impose higher (but not lower) margin requirements on their own. NYSE Rule 431(d). Thus, in a short sale against the box, the seller is free to withdraw up to 95 percent of the cash proceeds under NYSE Rule 431, but doing so incurs margin debt. *See* Plaintiff's Memorandum Opposing Defendants' Motion to Dismiss ("Opp.Mem.") at 4. In addition, the remaining five percent of the cash proceeds is available for the broker's use. *Id.*

loan of securities, the borrowing broker typically receives a portion of any interest earned on the collateral. The borrowing broker does not usually pass any of the interest on to its customer, although an exception is sometimes made for large or professional customers. Here, the Complaint and monthly account statements make clear that MLPF & S did, in fact, pass on some of this interest to Bissell. In September 1985, MLPF & S agreed to credit Bissell's account with 50 percent of Broker Call Rate ("BCR") interest on the entire short market value ("SMV") of his open short positions. This arrangement is reflected in Bissell's monthly statement for September 1985 and each month thereafter, and was made retroactive to January 1, 1985. In 1989, for example, Bissell's account was credited with $44,255.58 in interest, in effect reducing his 1989 margin interest charges from $94,429.97 to $50,174.39. *See* Complaint ¶ 32.

In essence, the Complaint in this action alleges that MLPF & S uses its customers' assets, in the form of cash and stock collateral and proceeds of short sales, to earn interest and to obtain other financial benefits without notifying the customer of this practice or sharing the proceeds with them. Based upon these allegations, Bissell and the putative class assert claims for securities fraud, breach of fiduciary duty, violation of the "shingle theory" and principles of trust and agency, breach of implied covenants of good faith and fair dealing, and violation of Article 9 of the Uniform Commercial Code.[6]

Although captioned "Second Amended Class Action Complaint," the pending Complaint is actually plaintiff's fourth complaint in this action. It was preceded by a "Substituted Amended Class Action Complaint," an "Amended Class Action Complaint," and an original "Class Action Complaint." Plaintiff has agreed and this Court has "so ordered" that the pending Complaint is "the final complaint in this action and said complaint may not be amended hereafter for any reason." *See* Stipulation and Order dated October 11, 1994.

## DISCUSSION

### A. Standard for Motion to Dismiss

In ruling upon MLPF & S's motion to dismiss the Complaint under Rule 12(b)(6), the Court must view the Complaint in the light most favorable to Bissell, accepting all allegations contained in the Complaint as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). All reasonable inferences are to be drawn in the plaintiff's favor, and the claims should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### B. Securities Fraud Claims

Bissell bases his securities fraud claims upon MLPF & S's alleged violation of two SEC rules promulgated under section 10(b) of the 1934 Act: Rule 10b–5 and Rule 10b–16.

#### 1. Rule 10b–5

To state a claim under section 10(b) and Rule 10b–5, a plaintiff must allege that "in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 264 (2d Cir.1993) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985)), *cert. denied,* —— U.S. ——, 114

---

6. Plaintiff asserts his state law claims under the Court's diversity jurisdiction as well as its supplemental jurisdiction. In a recent letter to the Court, MLPF & S suggests for the first time that the Court reject plaintiff's invocation of diversity jurisdiction and decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367. MLPF & S argues that while the Complaint alleges the parties' diverse domiciles, plaintiff fails to allege the

amount in controversy as required under 28 U.S.C. § 1332(a). The Court, however, declines to rule on this basis. The Complaint indicates that the amount in controversy exceeds $50,000. *See* Complaint ¶ 32 ("Thus, in this single example, MLPF & S misappropriated most, if not all, of $50,174.39 of revenues"). Accordingly, the Court reaches the merits of the arguments regarding dismissal of the state law claims.

S.Ct. 1397, 128 L.Ed.2d 70 (1994) (internal quotations omitted). The Supreme Court recently stated that Rule 10b–5 should be interpreted strictly to bar "10b–5 challenges to conduct not prohibited by the text of the statute." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, ——, 114 S.Ct. 1439, 1446, 128 L.Ed.2d 119 (1994). The Court emphasized that " 'not every instance of financial unfairness constitutes fraudulent activity under § 10(b).' " *Id.* (citation omitted).

■ Here, plaintiff's claim under Rule 10b–5 must be dismissed because it fails to satisfy the requirement that the alleged fraud was "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To satisfy this requirement, the misrepresentation or omission must pertain to the securities themselves; allegations of fraud merely involving securities are not sufficient. *See Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Judge Chin of this Court recently dismissed a securities fraud complaint similar to Bissell's, holding that the broker-dealer's alleged "failure to disclose that it earned interest on its customers' collateral and the proceeds of their short sales was not 'in connection with' the purchase or sale of securities." *Levitin v. PaineWebber, Inc.*, 933 F.Supp. 325, 329 (S.D.N.Y.1996). I concur with Judge Chin's thorough analysis of the "in connection with" requirement in *Levitin* and reach the same conclusion here.

The law of this Circuit is clear that unless the alleged fraud concerns the value of the securities bought or sold, or the consideration received in return, such fraud is not "in connection with" the purchase or sale of a security within the meaning of Rule 10b–5. *See Chemical Bank*, 726 F.2d at 943 (claim against accountants for losses related to loans secured by notes of company audited by the accountants held not to be "in connection with" the purchase or sale of a security); *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 108 (2d Cir.1986) (claim that investor was fraudulently induced to liquidate securities portfolio to invest proceeds with commodities trader held not to be "in connection with" the sale of a security).

In *Chemical Bank*, a leading decision on the "in connection with" requirement of Rule 10b–5 liability, Judge Friendly described the rationale for this requirement as follows:

> The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

> \*       \*       \*       \*       \*       \*

> [I]t is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the [purchase or sale] of a security is a part.

726 F.2d at 943. Although some commentators and courts have suggested that the connection between fraud and a securities transaction can be very tenuous and still satisfy the "in connection with" requirement, Judge Friendly rejected this view in *Chemical Bank*. He noted that statements to this effect "have usually been made in cases … where the connection was anything but tenuous. In cases near the borderline, courts have warned that '[i]t is important that the standard be fleshed out by a cautious case-by-case approach.' " *Id.* at 942 (citations omitted).

Following *Chemical Bank*, courts in this Circuit have consistently held that "there is no securities law violation unless the misrepresentations or omissions involved in a securities transaction pertain to the securities themselves." *Abrash v. Fox*, 805 F.Supp. 206, 208 (S.D.N.Y.1992) (clients' claims against attorney for securities fraud held not to be in connection with the purchase of securities where claim alleged that attorney made misrepresentations as to his qualifications and intentions to act as business and legal advisor); *see also Pross v. Katz*, 784 F.2d 455, 457–58 (2d Cir.1986) (investment manager's alleged breach of promise to perform fiduciary duties held not to be in connection with purchase or sale of securities);

*Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co.,* 770 F.Supp. 176, 181 (S.D.N.Y.1991) (alleged embezzlement of securities by broker did not constitute violation of Rule 10b–5; "in connection with" requirement was not satisfied because "Rule 10b–5 is designed to protect market transactions, not trust relationships"); *Bosio v. Norbay Sec., Inc.,* 599 F.Supp. 1563, 1566 (E.D.N.Y.1985) (conversion by broker of proceeds of sale of a security not "in connection with" sale of the security because the broker's misrepresentation related "not to any inducement ... regarding the investment purpose of the sale, but to the arrangements concerning the mechanics of the sale").

Bissell argues that "a fraudulent act need not affect the value of securities" to violate section 10(b) and Rule 10b–5. Opp.Mem. at 18. However, neither of the cases relied on by plaintiff—*Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 651 F.2d 615 (9th Cir.1981), and *A.T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir.1967)—go "so far as [plaintiff] would take us here." *Chemical Bank,* 726 F.2d at 944. Judge Friendly discussed the reach of both *Arrington* and *Brod* in *Chemical Bank.* He noted that *Arrington* was "a classic case of misrepresentation by a broker with respect both to the specific securities being purchased and to the lack of risk in margin buying." *Id.* at 944 n. 24. In *Brod,* "there was no question that the [defendants'] fraud (placing orders for securities with the fraudulent intent of paying only if those had appreciated by the time payment was due) was in connection with the purchase and sale of securities." *Id.* Thus, neither *Arrington* nor *Brod* supports plaintiff's expansive view of the "in connection with" requirement.

The facts and holding of *Vigilant Ins. Co. v. C. & F. Brokerage Servs.,* 751 F.Supp. 436 (S.D.N.Y.1990), are particularly instructive here. In *Vigilant,* an exchange specialist firm employed "finders" or middle-men to locate stock from other brokerage houses in order to fund commitments to its own clients and cover its position in the market. The specialist firm provided cash collateral to the finders for the loans. Once the specialist firm covered its position in the market, it returned the stocks and received back the collateral. In addition to receipt of its collateral, the specialist firm was to receive an interest payment or "rebate." The finders allegedly diverted those rebates to themselves. The specialist's fidelity insurer sued the finders for securities fraud under section 10(b), seeking to recover the misappropriated rebates. In dismissing the securities fraud claim, the court held that "to adequately state a cause of action [under section 10(b) and Rule 10b–5], the misrepresentation must relate to the value of the security." 751 F.Supp. at 438. The court further noted that "the fraud alleged regards retention of interest on the collateral [for stock loans] and a diversion of proceeds, neither of which affects the worth of the stocks." *Id.* Therefore, since the investment value of the stocks involved was not related to the finder's alleged fraud, the court held that the "in connection with" requirement was not satisfied. *Id.*

Here, as in *Vigilant,* the alleged fraud relates to the retention of interest on collateral rather than the value of the securities sold by Bissell or the price that he received for selling those securities. As the Second Circuit's decisions in *Chemical Bank* and *Saxe* make clear, a fraud is "in connection with" the purchase and sale of securities when the fraud concerns the value of the securities bought or sold, or the consideration received in return. As noted above, Judge Friendly held in *Chemical Bank* that "it is not sufficient to allege that a defendant has committed [fraud] in a transaction of which the [purchase or sale] of a security is a part." 726 F.2d at 943. Bissell makes no allegation that MLPF & S's allegedly fraudulent practices related in any way to the value of the securities that plaintiff sold short or the consideration he received. Although the "nondisclosure of the interest [MLPF & S] earned on its customer's funds may have affected the customer's decision to open an account with defendant, the interest is not part of the consideration received by the customer for the sale of securities." *Levitin,* 933 F.Supp. at 329 (citing *Saxe,* 789 F.2d at 108). As Judge Chin held in *Levitin,* the "alleged nondisclosure at issue ... pertains not to the sale of the securities or the value

of the securities themselves, but to the terms of the relationship between the broker and the customer." *Id.* Accordingly, the alleged nondisclosure does not constitute securities fraud in violation of section 10(b) and Rule 10b–5.

Since MLPF & S's alleged failure to disclose that it earned interest on its customers' collateral and the proceeds of their short sales was not "in connection with" the purchase or sale of securities, plaintiff's securities fraud claim based upon Rule 10b–5 is hereby dismissed. Because I hold that Bissell has failed to satisfy the "in connection with" requirement, I need not reach MLPF & S's arguments that plaintiff has failed to adequately plead other elements of his securities fraud claim.

### 2. Rule 10b–16

Plaintiff also alleges that MLPF & S violated SEC Rule 10b–16, the SEC analogue to the Truth-in-Lending Act. *See* 17 C.F.R. § 240.10b–16. Rule 10b–16 prohibits brokers from extending credit to customers in securities transactions without disclosing the terms of the extension of credit, including interest rates, the method of determining balances, and other charges resulting from the extension of credit. *See Levitin,* 933 F.Supp. at 330. Plaintiff alleges that MLPF & S's conduct violated Rule 10b–16's requirements concerning disclosure of (a) finance charges, (b) conditions under which annual rates of interest can be charged, (c) rebates, (d) methods of computing interest, (e) methods of determining debit balance or balances on which interest is to be charged and whether credit is to be given for credit balances in cash accounts, (f) other charges resulting from extensions of credit, and (g) the nature of the broker's interest in the security or other property held as collateral and the conditions under which additional collateral can be required. Complaint ¶ 40.

Although Rule 10b–16 does not create an express cause of action for violation of its provisions and the Second Circuit has declined to resolve the issue of whether an implied cause of action exists, *see Zerman v. Ball,* 735 F.2d 15 (2d Cir.1984), other circuit and district courts have recognized an im-

plied cause of action under section 10(b) of the 1934 Act for violations of Rule 10b–16. *See, e.g., Angelastro v. Prudential–Bache Secs., Inc.,* 764 F.2d 939, 949–50 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 539 (9th Cir.1984); *Liang v. Dean Witter & Co.,* 540 F.2d 1107, 1113 n. 25 (D.C.Cir.1976); *Metzner v. D.H. Blair & Co.,* 689 F.Supp. 262 (S.D.N.Y.1988); *Slomiak v. Bear Stearns & Co.,* 597 F.Supp. 676 (S.D.N.Y.1984).

As with the other SEC regulations promulgated under section 10(b) of the 1934 Act, however, "a cause of action for violation of Rule 10b–16 can only be maintained where the claim stems from the enabling statute's prohibition of the use of deceptive and manipulative devices in connection with the purchase or sale of securities." *Levitin,* 933 F.Supp. at 330; *see Angelastro,* 764 F.2d at 946; *Greenblatt v. Drexel Burnham Lambert, Inc.,* 763 F.2d 1352, 1358 n. 8 (11th Cir.1985) (without deciding issue, court stated that "violations of Rule 10b–16 may give rise to a private cause of action under section 10(b) only to the extent that the violations arise out of the purchase or sale of securities"); *cf. Metzner,* 689 F.Supp. at 267 (holding that plaintiff stated claim for violation of Rule 10b–16 where it could be inferred that plaintiffs were misled into purchasing securities due to broker's violation of Rule 10b–16). Here, as in *Levitin,* where the alleged fraud does not pertain to the purchase or sale of securities, Bissell cannot recover under section 10(b) for the alleged violations of Rule 10b–16. *Levitin,* 933 F.Supp. at 330.

Even if this Court were to hold that the alleged non-disclosures *did* pertain to the purchase or sale of securities, three alternative grounds exist for dismissing plaintiff's claims under Rule 10b–16: (1) the statute of limitations for certain claims under Rule 10b–16 has expired; (2) plaintiff does not allege that MLPF & S failed to establish procedures to provide the requisite Rule 10b–16 disclosures; and (3) Rule 10b–16 does not require the specific disclosures which plaintiff contends that MLPF & S failed to make.

The Complaint does not specify which specific provision of Rule 10b–16 was allegedly violated. Subsection (a)(1) requires the broker to establish procedures to assure that each customer is given a written statement disclosing information regarding interest charges at the time an account is opened; subsection (a)(2) requires the broker to establish procedures to assure that each customer is given periodic statements disclosing credit balances, interest charges, and all other charges resulting from the extension of credit.

Plaintiff appears to concede that any claim based on subsection (a)(1) is time-barred, *see* Opp.Mem. at 21 ("a claim under 10b–16(a)(1) may now be time barred"), and the Court so finds. Litigation under section 10(b) "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). Bissell opened his margin account in 1981 but did not commence this action until December 1, 1993. Thus, any claim under subsection (a)(1) of Rule 10b–16 based on MLPF & S's alleged failure to disclose credit information when Bissell's account was opened is time-barred because it was filed more than three years after the alleged violation.

In addition, courts recognizing an implied right of action under Rule 10b–16 have required the plaintiff to allege that the defendant failed to establish procedures to provide the requisite Rule 10b–16 disclosures. *See Slomiak,* 597 F.Supp. at 685; *see also Nick v. Shearson/American Express, Inc.,* 612 F.Supp. 15, 18 (D.Minn.1984) (plaintiff must allege that defendants "failed to establish procedures to provide credit disclosure or that the terms initially established for the ... [plaintiff's] account ... were changed without the required notice"). Bissell's Complaint fails to make such allegations.

Finally, plaintiff's discussion in his Opposition Memorandum regarding the adequacy of MLPF & S's monthly statements demonstrates that there is no violation of the specific disclosure requirements of subsection (a)(2) of Rule 10b–16. In his memorandum, plaintiff reproduces certain entries from his monthly statement for September 1985. After commenting (with apparent approval) on MLPF & S's disclosures relating to interest charges, plaintiff finds fault with the entries relating to interest credits. Specifically, plaintiff states that

> with respect to credit interest ("Cr.Int."), Merrill Lynch simply reported "50% BCR SMV." ("BCR" means "brokers call rate"; "SMV" means "short market value".) *Merrill Lynch did not quantify BCR.*

Opp.Mem. at 9 (emphasis added). However, unlike disclosures relating to interest *charges* which do require an itemized breakdown under Rule 10b–16, there is no SEC rule or regulation requiring any particular disclosure format with respect to interest *credits*.

For the foregoing reasons, plaintiff's claim under Rule 10b–16 is hereby dismissed.

## B. *Other Claims*

### 1. Breach of Fiduciary Duty, the Shingle Theory, and Principles of Trust and Agency

In his third claim for relief, plaintiff asserts that under the law of New York, MLPF & S, "as a broker acting as agent for its customers, is under a fiduciary duty to deal fairly and in complete candor with its customers concerning the matters entrusted to the broker, and not to misappropriate the economic benefits of collateral or property of the *cestui qui* trust." Complaint ¶ 44. In his fourth and fifth claims, plaintiff alleges similarly that MLPF & S violated the "shingle theory"[7] and principles of "trust and

---

7. The "shingle theory" denotes the proposition that a broker-dealer, by holding itself out as competent to conduct a brokerage business, owes its customer certain duties, including the duty not to sell securities at prices far in excess of market prices. *See, e.g., Charles Hughes & Co., Inc. v. SEC,* 139 F.2d 434, 436–37 (2d Cir.1943), *cert. denied,* 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed.

1077 (1944); *see also* 8 Louis Loss & Joel Seligman, Securities Regulation 3772–98 (3d ed. 1991). Recent cases have harmonized the older "shingle theory" cases with the Supreme Court's Rule 10b–5 fraud jurisprudence by identifying both a duty to disclose and a material omission. Loss & Seligman, *supra,* at 3778. To the extent plaintiff's "shingle theory" claim relies on a vio-

agency" in connection with his short sales. Since these claims all allege theories of fiduciary law, they will be resolved together.

The issue posed by these related claims is whether MLPF & S owes plaintiff a fiduciary or agency duty with respect to the specific practices regarding collateral in dispute in this action. MLPF & S concedes that it owes a fiduciary duty to the plaintiff—arising from its role as plaintiff's agent—to execute his securities transactions at the best prices reasonably obtainable. Plaintiff makes no allegation that MLPF & S failed to carry out this obligation. However, MLPF & S disputes that it owes plaintiff a fiduciary duty with respect to the collateral practices in question, arguing that the duty which plaintiff seeks to impose does not implicate MLPF & S's role as plaintiff's agent or fiduciary. Rather, MLPF & S contends, such a duty arises—if at all—from the relationship with MLPF & S recognized in plaintiff's margin agreement, namely, that of debtor and creditor. The Court agrees, for the reasons set forth below.

■ Under New York law, the "'mere existence of a broker-customer relationship is not proof of its fiduciary character.'" *Rush v. Oppenheimer & Co.*, 681 F.Supp. 1045, 1055 (S.D.N.Y.1988) (quoting *Fey v. Walston & Co.*, 493 F.2d 1036, 1049 (7th Cir.1974)). The fiduciary obligation between a broker and customer under New York law is limited to affairs entrusted to the broker, and "[t]he scope of affairs entrusted to a broker is generally limited to the completion of a transaction." *Schenck v. Bear, Stearns & Co.*, 484 F.Supp. 937, 947 (S.D.N.Y.1979), *overruled on other grounds, Conway v. Icahn & Co.*, 16 F.3d 504 (2d Cir.1994). In the absence of discretionary trading authority delegated by the customer to the broker—and none is alleged in the case at bar—a broker does not owe a general fiduciary duty to his client. *Schenck*, 484 F.Supp. at 946–47.

■ The law of states other than New York is similar. The Arizona Supreme Court has stated that

[t]he agency relationship between customer and broker normally terminates with the execution of the order because the broker's duties, unlike those of an investment advisor or those of a manager of a discretionary account are only to fulfill the mechanical, ministerial requirements of the purchase or sale of the security.... While a broker and a customer have an agent-principal relationship with respect to each transaction to buy or sell, they may also have a separate and distinct relationship as creditor and debtor.

*Walston & Co. v. Miller*, 100 Ariz. 48, 51–52, 410 P.2d 658, 661 (1966); *see also Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 769 F.2d 561 (9th Cir.1985) (finding no continuing fiduciary relationship where customer had a non-discretionary account with broker); *Leib v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 461 F.Supp. 951 (E.D.Mich.1978) (finding that broker owed only limited, transactional duties to customer who maintained non-discretionary account), *aff'd*, 647 F.2d 165 (6th Cir.1981). The SEC has also recognized that the relationship of brokers to customers with respect to credit and debit balances in their accounts is that of debtor and creditor. In adopting Rule 15c3-2 governing the use of free credit balances in customer accounts, the SEC explained:

Many customers of broker-dealers are not aware (1) that when they leave free credit balances with a broker-dealer the funds generally are not segregated and held for the customer, but are commingled with other assets of the broker-dealer and used in the operation of the business, and (2) that the relationship between the broker-dealer and the customer as a result thereof *is that of creditor-debtor.*

lation of section 10(b) and Rule 10b–5, the claim must fail because (1) a breach of fiduciary duty does not give rise to a securities fraud claim merely because it involves a securities transaction, *see Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 479–80, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977), and (2) the alleged nondisclosure was not in connection with the purchase or sale of securities, as discussed above. *See Levitin*, 933 F.Supp. at 329–30. To the extent plaintiff merely seeks to rely on breach of a fiduciary duty, the "shingle theory" claim will be considered in tandem with plaintiff's state law fiduciary and agency claims.

Adoption of Rule 15c3–2 under the Securities Exchange Act of 1934, Exchange Act Release No. 34–7325, 1964 SEC LEXIS 131, *2–3 (1964) (emphasis added). *See also* Newman, SEC No–Action Letter, [1970–71] Fed.Sec. L.Rep. (CCH) ¶ 78,177 (May 6, 1971) (declining to require payment of interest on free credit balances, SEC staff found the question "governed by contract between the parties").

Relying primarily on *Conway v. Icahn & Co., supra,* plaintiff argues that the relationship between plaintiff and MLPF & S is fiduciary in nature in *every* respect. Although there is language in Conway broadly stating that "[t]he relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature," 16 F.3d at 510, a close analysis of the *Conway* case reveals that it does not support plaintiff's position.

In *Conway,* the plaintiff was a customer of a discount brokerage, Icahn & Co., which cleared its transactions through another broker-dealer, Cowen & Co. *Conway,* 16 F.3d at 505. Cowen & Co., not a party to the lawsuit, extended credit to plaintiff in his margin account. Plaintiff alleged that his relationship with Icahn & Co. was such that he did not permit Icahn & Co. to buy or sell securities in his account without his prior permission. In contrast, plaintiff's margin agreement with clearing broker Cowen & Co. permitted it to liquidate securities in plaintiff's margin account without prior notice to plaintiff. In October 1987, after a precipitous decline in stock prices and a corresponding deterioration in plaintiff's equity in his margin account, Cowen & Co. directed Icahn & Co. to liquidate securities in plaintiff's account to meet Cowen & Co.'s minimum margin requirements. *Id.* at 505–07. Addressing these facts and the status of Icahn & Co. as introducing broker, the Second Circuit stated the fairly unremarkable position that Icahn & Co. owed a fiduciary duty as an agent of the plaintiff to inform him of Cowen & Co.'s margin call and to give him an opportunity to deposit additional collateral. *Id.* at 510. The Circuit made clear that Cowen & Co., as plaintiff's creditor, stood in a categorically different relationship with plaintiff.

Here, MLPF & S does not utilize a clearing broker. It is "self-clearing" and as such occupies two roles: that of plaintiff's broker, and that of plaintiff's creditor. As plaintiff's broker, MLPF & S is under a fiduciary duty to execute his transactions at the best prices reasonably available and to offer honest and complete information when recommending the purchase or sale of a security. As plaintiff's creditor, MLPF & S has no fiduciary obligations. This important distinction is lost in plaintiff's argument that MLPF & S had a fiduciary duty to disclose information regarding its retention of interest on collateral and short sale proceeds.

Because the obligations plaintiff seeks to impose on MLPF & S do not arise from affairs entrusted to the broker as a fiduciary, agent, or trustee of the plaintiff, there can be no claim for breach of fiduciary duty, the "shingle theory," or principles of trust and agency on the facts of this case. Accordingly, plaintiff's third, fourth, and fifth claims are hereby dismissed pursuant to Rule 12(b)(6).

### 2. Breach of Implied Covenants

In his sixth claim, plaintiff alleges that MLPF & S violated implied covenants of good faith and fair dealing contained in his pledge agreement with MLPF & S. Complaint ¶¶ 51–54. For the reasons set forth below, this claim is also dismissed pursuant to Rule 12(b)(6).

Under New York law, "[a] party's actions may implicate the implied covenant of good faith when it acts so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties." *Bank of China v. Chan,* 937 F.2d 780, 789 (2d Cir.1991). "[N]either party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract," or to violate the party's presumed or reasonable expectations. *M/A–COM Security Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990).

An implied covenant of good faith and fair dealing, however, "arises only out of the known reasonable expectations of the

other party which arise out of the agreement entered into. The covenant does not create duties which are not fairly inferable from the express terms of that contract." *Interallianz Bank AG v. Nycal Corp.*, No. 93 Civ. 5024, 1994 WL 177745 (S.D.N.Y.1994), at *8 (citing *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992)).

Here, Bissell attempts to use the implied covenants claim to create additional duties not fairly inferable from the express terms of his pledge agreement with MLPF & S. The customer agreement with MLPF & S that Bissell signed contained the following provision:

> **Pledge of Securities and Other Property**
> All securities and other property now or hereafter held, carried or maintained by you in your possession in any of the accounts of the undersigned may be pledged and repledged by you from time to time, without notice to the undersigned, either separately or in common with other such securities and other property, for any amount due in the accounts of the undersigned, or for any greater amount, and you may do so without retaining in your possession or under your control for delivery a like amount of similar securities or other property.

*See* Exhibit M to Memorandum in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint ("Def.Mem.").

This pledge agreement does not require payment to plaintiff of any "interest, other profits or economic benefits" earned on customers' property pledged as collateral in connection with short sales, nor does it require disclosure of the fact that MLPF & S may generate revenues from customer collateral and short sale proceeds. Plaintiff's implied covenant theory, if adopted by this Court, would create a duty well beyond the duties inferable from the express terms of the pledge agreement itself. Accordingly,

MLPF & S's motion to dismiss Bissell's sixth claim for relief is granted.

### 3. UCC Claim

In his seventh and final cause of action, plaintiff alleges a claim under New York's Uniform Commercial Code and underlying common law principles. Section 9–207 of the UCC provides in relevant part:

> (2) Unless otherwise agreed, when collateral is in the secured party's possession
>
> . . .
>
> (c) the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation....

N.Y. [U.C.C.] Law § 9–207(2)(c) (McKinney 1990). Plaintiff alleges that MLPF & S's practices violate section 9–207(2)(c) of the Code "by neither remitting the profits from the collateral nor by applying such profits in reduction of the secured obligation." Complaint ¶ 58.

Assuming, *arguendo*, that section 9–207(2)(c) applies to the situation herein[8], Plaintiff's claim under section 9–207(2)(c) is clearly barred by the terms of the provision itself. Section 9–207(2)(c) requires the secured party to apply any money received from the collateral to the reduction of the outstanding debt "[u]nless otherwise agreed." *See* N.Y. [U.C.C.] Law § 9–207(2) (McKinney 1990). The parties here have "otherwise agreed" since at least 1985, when Bissell arranged with MLPF & S to receive interest based on the short market value of his open short sales. This arrangement is reflected in Bissell's monthly statements, starting with his statement for September 1985. *See* Exhibit E to Def.Mem. This agreement continued in effect through the filing of MLPF & S's motion to dismiss, and Bissell concedes that he received a total of

---

**8.** MLPF & S argues that Article 9 of the UCC specifically excludes the transaction in question, that UCC section 9–207(2)(c) does not apply to the "interest, other profits or economic benefits" earned by MLPF & S from its use of plaintiff's collateral, and that Article 9 is preempted by the federal regulatory framework dealing with short sales transactions. However, for the purposes of this motion, the Court will assume that the UCC provision applies and is not preempted, because even if it does apply Bissell still fails to state a claim under the terms of the provision.

$44,255.58 in interest in 1989 alone. Complaint ¶ 32. Accordingly, because the parties have "otherwise agreed," Bissell has no claim for relief under section 207 of the UCC, and this claim must be dismissed.

### CONCLUSION

For the reasons set forth above, plaintiff's Second Amended Class Action Complaint is dismissed in its entirety with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff's motion for class certification is denied as moot. The Clerk of the Court is directed to close the file in this case.

SO ORDERED.