ASCENSION TECHNOLOGY
CORPORATION,
Plaintiff,

v.

MCDONALD INVESTMENTS,
INC., Keycorp, and Robert
F. Hoppe, Defendants.

No. 2:01–CV–370.

United States District Court,
D. Vermont.

March 11, 2003.

Dennis L. Johnson, Esq., South Burlington, VT, for Plaintiff.

Peter F. Young, Esq., Burlington, VT, for Defendants.

## OPINION AND ORDER

SESSIONS, Chief Judge.

Plaintiff Ascension Technology Corporation ("Ascension") has sued its brokerage firm, McDonald Investments, Inc. ("McDonald"), the broker with whom it dealt ("Hoppe"), and McDonald's parent corporation, KeyCorp, a bank holding company, in connection with Ascension's investments in corporate bonds. Ascension alleges violations of the Exchange Act's § 10(b) and § 20(a), the Vermont Consumer Fraud Act and the Vermont Securities Act; negligent misrepresentation; and breach of fiduciary duties.

The Defendants seek dismissal of the counts alleging violations of the Vermont Consumer Fraud Act (Count III) and breach of fiduciary duties (Count VI) and dismissal of the entire suit as against Key-Corp, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons that follow, the motion (Doc. 16) is granted in part and denied in part.

## I. *Factual Background* [1]

In late summer or early fall of 1999 Ascension's president met with its commercial banker, a vice president at Key Bank. Ascension had a large cash balance being maintained in a money market account. The Key Bank vice president suggested that McDonald, a Key Bank affiliate, could obtain a better interest rate for Ascension.

In September or October of 1999 the banker and Hoppe, an experienced broker at McDonald, jointly called Ascension's president to discuss investing Ascension's cash. Hoppe was informed that Ascension's president was very conservative in his money management and business practices and was looking for a very safe, conservative investment that would generate a better rate of return than the approximately five percent Ascension was currently obtaining. Hoppe recommended "commercial paper," saying that "you can't lose your principal, only the interest if you sell before it is due."

Ascension opened an account with McDonald. On October 22, 1999, Hoppe called Ascension's president and recommended that he buy HealthSouth Corporate Notes. These notes were corporate bonds, not commercial paper. Hoppe mentioned no risks associated with the investment, nor any negative information regarding HealthSouth Corporation ("HealthSouth"). Based on Hoppe's recommendation, one million dollars worth of HealthSouth Senior Subordinated Notes was purchased for Ascension's account.

---

**1.** As is appropriate when considering a Rule 12(b)(6) motion, the Court accepts as true Ascension's well-pleaded allegations, and draws all reasonable inferences in its favor. *See DeMaria v. Andersen,* 318 F.3d 170, 173 (2d Cir.2003).

The notes had a coupon rate of 9.5% and a maturity date of April 1, 2001. When purchased, the HealthSouth notes were rated predominately speculative (Ba2) by Moody's and medium grade by Standard & Poor's. The notes were not a conservative investment, and were unsuitable for Ascension's stated investment goals.

Ascension's president was unfamiliar with transactions involving bonds, notes, or debt instruments of any kind. Ascension's account was a "repo" account, used only to conduct transactions in securities. Except for months when transactions were conducted in the "repo" account, Ascension did not receive statements regarding its account, and it was therefore unaware of any diminution in value of its investment. In addition to failing to disclose publicly available negative information regarding the financial health of HealthSouth at the time the notes were purchased, the Defendants failed to apprise Ascension of a continuing stream of negative news regarding HealthSouth's operations.

In August 2000 Hoppe recommended Federal–Mogul Corporate Notes as an investment that could earn a better rate than the HealthSouth notes. Hoppe stated that although Ascension would lose money on the trade out of the HealthSouth notes, that loss would be offset by the increased return. When Ascension's president asked how safe the proposed investment was, Hoppe responded that Key Bank had purchased $300 million of the same investment, and that the investment was conservative. Contrary to Hoppe's representations, the Federal–Mogul notes were not a conservative investment, and were not suitable for Ascension's stated investment goals. On August 10, 2000, Ascension purchased $930,036 in Federal–Mogul Corp. Non–Callable Medium Term Notes, with a coupon rate of 8.16% and a maturity date of March 6, 2003, plus $13,600 of accrued interest. The following day, Ascension's HealthSouth notes were sold, causing Ascension to suffer an approximately $5,000 loss.

At the time Ascension purchased Federal–Mogul notes, publicly available information indicated that Federal–Mogul was in financial trouble, and faced substantial exposure to asbestos litigation liability. Following Ascension's purchase of the notes, the Defendants failed to inform it of a wealth of negative news regarding Federal–Mogul's financial health, including demotions in debt rating to "speculative" by Moody's and Standard & Poor's. In October 2001, Federal–Mogul filed for Chapter 11 bankruptcy protection. As of March 31, 2002, Ascension's Federal–Mogul notes were worth approximately $70,000.

In October 2000, Hoppe discussed a potential investment in Conseco Inc. notes with Ascension's president. Hoppe did not discuss any risks with the investment, nor did he discuss the ratings of the notes. On October 26, 2000, on Hoppe's recommendation and based on the understanding that Key Bank was also investing in the notes, Ascension purchased $925,000 of Conseco Inc. Non–Callable Putable Notes, with a coupon rate of 6.4% and a maturity date of June 15, 2001, plus $24,177.78 of accrued interest. At the time of purchase these notes were rated B1 (speculative, low grade) by Moody's and BB (predominately speculative) by Standard & Poor's, or "junk" bond ratings. The Conseco notes were not a conservative investment, nor were they consistent with Ascension's investment goals.

Although the financial press was reporting a variety of negative financial information regarding Conseco, in April 2001 Hoppe recommended that Ascension roll out of the maturing Conseco notes into a different set of Conseco notes. Hoppe told Ascension's president that the Conseco notes had generated a return of 23.486%,

and he encouraged Ascension to act quickly to acquire the new notes. Acting on Hoppe's recommendation, the Conseco notes were redeemed in June 2001 and the proceeds were rolled into another issue of Conseco notes with a coupon rate of 8.5% and a maturity date of October 15, 2002. Ascension was not informed that these new bonds also carried "junk" status ratings when Hoppe recommended them. The negative financial information continued, but, taking advantage of a spike in the value of the notes in February 2002, Ascension sold its Conseco notes for $900,000 in principal and $27,625 in accrued interest.

Ascension claims that the Defendants failed to disclose that the investments were not commercial paper, and that the principal of the notes it bought was at risk; that the HealthSouth notes were not a conservative investment; that Ascension would only receive statements during months in which there were transactions in its account; and that both purchases of Conseco notes were not a conservative investment. It claims that the Defendants misrepresented that the Federal–Mogul notes paid a better return than the HealthSouth notes; that the Federal–Mogul notes were a conservative and safe investment; and that Ascension had obtained a 23.486% return on its first purchase of Conseco notes. Ascension alleges that the Defendants acted with knowledge or with reckless disregard of facts readily available to them.

## II. *Legal Standard*

To prevail on a motion to dismiss for failure to state a claim, the Defendants must show beyond doubt that Ascension can prove no set of facts in support of its claims that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP.,* 322 F.3d 147, 157 (2d Cir.2003).

The issue is not whether Ascension is likely to prevail on its claims, but whether it is entitled to offer evidence to support its claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court accepts the factual allegations of Ascension's First Amended Complaint as true, drawing all reasonable inferences in its favor. *See DeMaria v. Andersen,* 318 F.3d 170, 173 (2d Cir.2003).

## III. *Discussion*

### A. *Vermont Consumer Fraud Act (Count III)*

The Defendants claim that Ascension, as a business entity, has no private right of action under the Vermont Consumer Fraud Act ("VCFA"). The VCFA affords a private right of action to any

> consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices prohibited by section 2453 of ... title [9], or who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of ... title [9], or prohibited by any rule or regulation made pursuant to section 2453 of ... title [9].

Vt. Stat. Ann. tit. 9 § 2461(b) (1993). The VCFA as amended in 1997 defines a "consumer" as

> any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary course of his or her trade or business but for his or her use or benefit or the use or benefit of a member of his or her household, or in connection with the operation of his or her household or a farm whether or not the farm is conducted as a trade or business, *or a person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale in the ordinary*

*course of his or her trade or business but for the use or benefit of his or her business or in connection with the operation of his or her business.*

Vt. Stat. Ann. tit. 9, § 2451a(a) (Supp.2002) (emphasis supplied).

 Under Vermont law a statute that refers to a "person" is construed to include a corporation. Vt. Stat. Ann. tit. 1, § 128 (1995) (" '[p]erson' shall include any ... corporation").[2] The VCFA thus countenances a lawsuit brought by a corporation that purchased goods or services for the use or benefit of the business or in connection with the operation of the business, as long as the goods or services were not purchased for resale in the ordinary course of the business. The Defendants' motion to dismiss for failure to state a claim under the VCFA is accordingly denied.

### B. *Breach of Fiduciary Duty (Count VI)*

 The Defendants argue that Vermont would not recognize the existence of a fiduciary duty between a broker and a customer with a non-discretionary account. Whether or not a fiduciary duty exists between parties is a question of law. *McGee v. Vt. Fed. Bank, FSB,* 169 Vt. 529, 530, 726 A.2d 42, 44 (1999) (mem.decision). There are no reported Vermont cases that have held that a securities broker owes a fiduciary duty to his client. Generally, in order for a fiduciary duty to exist, the relationship between the parties must have

"ripen[ed] into one in which [one party was] dependent on, and reposed trust and confidence in [the other party] in the conduct of its affairs." *Id.*

A substantial number of courts have held that brokers owe their clients fiduciary duties, although the nature and extent of those duties have been variously defined under state law. *See, e.g., S.E.C. v. Cochran,* 214 F.3d 1261, 1265 (10th Cir.2000) (under Oklahoma law party acting as agent or broker has fiduciary duty to disclose all material facts within scope of agency); *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,* 132 F.3d 1017, 1038 (4th Cir.1997) (under Texas law, where relationship between securities broker and customer is that of principal and agent, broker can be fiduciary); *O'Malley v. Boris,* 742 A.2d 845, 849 (Del.1999) (broker, as agent, has duty of good faith, fair dealing, loyalty, duty to act in customer's best interests); *Patsos v. First Albany Corp.,* 433 Mass. 323, 741 N.E.2d 841, 849 (2001) (scope of fiduciary duty depends on degree of discretion customer entrusts to broker); *Puckett v. Rufenacht, Bromagen & Hertz, Inc.,* 587 So.2d 273, 279 (Miss.1991) (broker's fiduciary duties in non-discretionary account less extensive than those in discretionary account); *State ex rel. Paine-Webber, Inc. v. Voorhees,* 891 S.W.2d 126, 130 (Mo.1995) (stockbroker's fiduciary duty includes, inter alia, duty to disclose material facts); *Dinsmore v. Piper Jaffray, Inc.,* 593 N.W.2d 41, 46 (S.D.1999)

---

**2.** This rule of construction may be ignored only if "such construction is inconsistent with the manifest intent of the general assembly or repugnant to the context of the same statute." Vt. Stat. Ann. tit. 1, § 101 (1995). The Defendants suggest that had the legislature intended to include corporations within the definition of consumer it could have done so. Such language would have been redundant, given the legislature's presumed knowledge of its own statutory rules of construction. The Defendants further suggest that because the

1997 amendment also refined the statutory language of § 2451a by replacing the pronoun "his" with "his or her" instead of "his, her or its," the context denotes an intention to exclude business entities. The statement of purpose accompanying the house bill that proposed the 1997 amendment demonstrates the legislature's intention "to create a private cause of action for businesses under Vermont's consumer fraud statute." H. 226, 1997 Leg., 64th Biennial Sess. (Vt.1997).

(securities brokers are fiduciaries, owing customers duty of utmost good faith, integrity and loyalty). *But see Bissell v. Merrill Lynch & Co.*, 937 F.Supp. 237, 246 (S.D.N.Y.1996) (under New York law no general fiduciary duty to client with non-discretionary trading account), *aff'd* 157 F.3d 138 (2d Cir.1998); *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 517–18 (Colo.1986) (en banc) (stockbroker/customer relationship not per se fiduciary; depends on proof of practical control of account); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis.2d 127, 377 N.W.2d 605, 608 (1985) (no fiduciary duty to customer with non-discretionary account absent express contract or special circumstances). Some states draw a sharp distinction between discretionary and non-discretionary accounts; others do not. *Compare Bissell*, 937 F.Supp. at 246, *and Merrill Lynch*, 377 N.W.2d at 608, *with O'Malley*, 742 A.2d at 849–50 (fiduciary duty of loyalty may be breached even in non-discretionary account), *and Patsos*, 741 N.E.2d at 850 (whether broker has assumed general fiduciary obligations of discretionary account is fact-based inquiry); *see also Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 530 (5th Cir.1987) (no bright-line distinction between fiduciary duty owed customers with discretionary as opposed to non-discretionary accounts, but nature of account is factor to be considered).

The determination of whether a fiduciary relationship existed between Ascension and any of the Defendants must await factual development. Assuming at this stage of the litigation that the factual allegations in Ascension's complaint are true, Ascension may be able to establish that under the circumstances its relationship exhibited the requisite degree of dependency under Vermont law. As the Vermont Supreme Court stated in a case that sought to establish the existence of a fiduciary duty between directors of a corporation and its creditors, "[t]he legal theory of a case should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations." *Ass'n of Haystack Prop. Owners, Inc. v. Sprague*, 145 Vt. 443, 447, 494 A.2d 122, 125 (1985).[3] In this situation as well, this Court "cannot say as a matter of law at this point that there is no possibility that [Ascension] could present sufficient evidence to establish a fiduciary duty." *Id.*, 145 Vt. at 448, 494 A.2d at 126. The motion to dismiss for failure to state a claim for breach of fiduciary duty is denied.

## C. *Claims Against KeyCorp.*

"[A] parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). Nor can liability be imposed on a parent corporation for the acts of its wholly-owned subsidiary based solely on the parent's "active participation in or control of the subsidiary's board of directors." *Greene v. Long Island R. Co.*, 280 F.3d 224, 234 (2d Cir.2002). The corporate veil may, however, be pierced when "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud." *Bestfoods*, 524 U.S. at 62, 118 S.Ct. 1876; *see also Agway, Inc. v. Brooks*, 173 Vt. 259, 262, 790 A.2d 438, 441 (2001). And in cases where the parent so dominates and controls the subsidiary that the subsidiary's separate entity is essentially disregarded, the parent may be

---

3. Whether Ascension's claim of breach of fiduciary duty will withstand summary judgment is, of course, an issue that the Court does not address here.

held legally accountable for the actions of the subsidiary. *Thomson–CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 777 (2d Cir.1995); *see also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.,* 2 F.3d 24, 26 (2d Cir.1993).

■ Ascension has alleged that Mc-Donald is a wholly-owned subsidiary of KeyCorp (First Am. Compl. ¶¶ 2, 14, 45(a)); that KeyCorp is a "controlling person" of McDonald and Hoppe, as the term is used in Section 20(a) of the Exchange Act (*id.* ¶ 15); that KeyCorp's Vermont representative induced Ascension's president to open an account with McDonald (*id.* ¶ 29); and that because KeyCorp held $300 million in Federal–Mogul and Conseco notes, Ascension's purchase of these notes would work to KeyCorp's benefit by supporting or increasing their market price. *Id.* ¶ 45(b).

■ Ascension has made no allegations of fraud or other wrongdoing on the part of KeyCorp. Nor has it alleged facts sufficient to warrant a conclusion that Mc-Donald is nothing more than KeyCorp's alter ego.[4] Absent any assertions of direct liability, or of facts that would warrant piercing the corporate veil, Ascension's First Amended Complaint fails to state a claim against KeyCorp. Accordingly, all claims against KeyCorp are dismissed. Ascension, however, has leave to file an amended complaint within thirty days of the date of this order, as requested in its opposition to the motion to dismiss.

---

4. Although Ascension has alleged that KeyCorp is a "controlling person" for purposes of liability under § 20(a) of the Exchange Act, conclusory allegations of the legal status of a defendant's acts need not be accepted as true for the purposes of ruling on a motion to dismiss. *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771–72 (2d Cir.1994).