Banknorth N.A. v. Littlefield, No. S0273-03 CnC  (Norton, J., Sept. 1, 2005)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT                                              SUPERIOR COURT
Chittenden County, ss.:                                      Docket No.S0273-03 CnC

BANKNORTH, N.A.

v.

LITTLEFIELD

ENTRY

       This is a case about, stock, margin loans, portfolio management, and questions about who bears responsibility when stock prices drop.  Plaintiff Bank moves for summary judgment on its primary claim of liability under its 2001 promissory note.  It also moves for summary judgment on several of Defendant Borrower's counterclaims and defenses.  These include , promissory estoppel, fraudulent and negligent misrepresentation, consumer fraud, breach of fiduciary duties, breach of an implied duty of care, and

breach of duty to maintain value under 9A V.S.A. § 9–207.

## Facts

In 1998, Borrower opened an investment account with Stratevest, an investment firm affiliated with Bank.[1]  This account was governed by a Managing Agency Agreement, which established the terms of the relationship, gave Stratevest some limited control over the account, and defined what powers Borrower retained over her investments.  The agreement created what is known as a custody account.  Stratevest was responsible for holding Borrower's shares, but it did not make any independent investment decisions or give official recommendations.  Under this type of account, Borrower maintained control and discretion over her stock investments as far as both a day-to-day basis as well as long term planning were concerned.  This account contained several of Borrower's stock holdings, including about 30,000 shares in Nortel Networks.  Borrower had worked at Nortel for 13 years and had earned several thousand stock options.

The evidence shows that Stratevest through its employees began to give Borrower informal recommendations and advice about her investments.  This information did not come with any imprimatur of

---

[1] In 2002, Banknorth, N.A. became the successor to both the Howard Bank, which had extended the line of credit to Borrower, and Stratevest, where Borrower had her investments.  Therefore, it is irrelevant whether liability in this case attaches to either Stratevest or the Howard Bank.  For the purpose of determining liability, however, it is important to note that prior to the 2002 merger, the Howard Bank and Stratevest were corporate affiliates and separate companies.

authority beyond its source or make any particular promise to Borrower but appears now to have been the beginnings of a larger campaign by Stratevest to convince Borrower to transfer more of her holdings to her Stratevest accounts and engage more of Stratevest's investment services. In late 1999 and 2000, Stratevest employees made several personalized pitches to Borrower touting the firm's acumen and the benefits to Borrower of consolidating her accounts under one roof where Stratevest could provide long term planning advice as well as day-to-day asset monitoring. As before, none of Stratevest's statements consisted of specific promises or mischaracterizations of Stratevest's current services. Stratevest did portray themselves as financial experts who were well-equipped to manage Borrower's investments and structured debt situation.

While Stratevest was attempting to persuade her, Borrower had another account with Merrill Lynch from which she borrowed $1,195,000 to purchase more of her Nortel stock options. Within a few months, in the fall of 2000, Borrower had paid this debt down by nearly $350,000. A few months later, she borrowed $600,000 more from Merrill Lynch to purchase a house in England. Around this time, Borrower's broker left Merrill Lynch and Borrower accepted advice from Stratevest employees in making her financing decisions. In early March 2001, Merrill Lynch demanded Borrower provide more collateral or sell off some of her stock shares to bring her debt to value ratio down. Borrower sold some stock, brought her debt back down to $842,000, and decided to close her Merrill Lynch accounts and move her assets to Stratevest. To complete this move, Borrower had to pay off her debt to Merrill Lynch. Through Stratevest, she obtained a line of credit from Bank for $1,044,000. This loan was secured by two investment accounts Borrower was establishing with Stratevest. Borrower used the money to pay off her loans at Merrill Lynch and to roll over the remaining balance of an existing loan that she had guaranteed for

her film production company.

Simultaneously, Borrower entered into a series of agreements with Stratevest and Bank. These agreements, like her 1998 agreement, established the responsibilities, rights, and powers of each party to manage and control the investment account and the line of credit. Unlike the earlier agreement, the 2001 agreements gave Stratevest much more control over Borrower's assets and obliged them to manage the investments. Borrower retain a certain amount of veto power over these decision, and Stratevest was obliged to inform Borrower about certain transactions that it planned.

Within a month, Borrower's investments had slipped below the Bank's required debt to value ratio. Bank, through its loan agreement, ordered Stratevest to sell off some of Borrower's shares. This reduced the debt by $333,000. In April 2001, Borrower signed the last of her agreements with Stratevest and Bank. As well, Merrill Lynch transferred the last of Borrower's assets to Stratevest. In June 2001, Borrower's stocks lost value again and Bank notified Borrower that it would order more shares sold if Borrower did not provide additional collateral or provide another way of paying down the loan balance. Borrower sought advice from Stratevest who recommended that she sell more of her Nortel shares. Borrower claims that she told Stratevest to sell what it needed to sell. She also expressed a concern about losing value in the stocks and ending up with nothing after the loan was paid off. Stratevest sold more shares and brought the loan-to-value ratio back into balance.

In the beginning of 2002, Banknorth became the successor to both Stratevest and the Howard Bank. Borrower signed a new loan agreement with it in February 2002, which extended the term of the loan to July 2002. At this time, Borrower indicated that she might obtain funds from other

sources besides her Stratevest investment accounts to pay off the loan. Borrower never provided any additional funds, and Bank sold her remaining stock shares and securities in October 2002. With their sale, Borrower's debt was reduced again to a balance of $271,000. This is the amount plus interest that Bank seeks to recover.

## Standard for Summary Judgment

A brief note about the standard for summary judgment applied here. The purpose of summary judgment "is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried." Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972). The standard for summary judgment is that the movant can show (1) that is no dispute of material fact and (2) that it is entitled to a judgment on the issue as a matter of law. V.R.C.P. 56(c); Fireman's Fund Ins. Co. v. CNA Ins. Co., 2004 VT 93, ¶ 8. In this case, many of Borrower's arguments are interrelated and dependent upon each other for their validity. To the extent that there remain issues of material fact or a question of a right to a judgment about the claims and counterclaims discussed in Bank's motion, the court has tried to clarify the position that the claim has within the law and what its limitations are in light of the established facts. In this respect the court hopes to narrow the relevant questions for each of these claims and focus the parties toward a final resolution. This is particularly important and noteworthy since much of the Bank's present motion and Borrower's opposition are devoted to clarifying or framing the legal theories of the parties' more generalized claims.

## Borrower's Liability and Regulation U of the federal Securities Exchange Act

Bank's sole question that it offers for summary judgment on its own claims is whether Borrower is liable under the promissory note. Bank also argues that it is eligible for $329,000, but it admits that this amount may ultimately be offset or adjusted by a counterclaim from Borrower's armada. Borrower, in turn, argues that this issue cannot be decided, because the loan is illegal and void as a matter of public policy under federal securities law. Borrower's argument is somewhat complex in that she simultaneously argues that the court should not deal with the underlying federal claims while at the same time ruling that the contract is illegal and void under the same federal law.

Borrower cites 15 U.S.C. § 78aa, otherwise known as § 27 of the federal Securities Exchange Act, which gives federal district courts exclusive jurisdiction over claims raised under its substantive provisions. At the same time, there is a well-established exception that, notwithstanding § 27's grant of exclusivity, allows state courts to hear affirmative defenses based on the Securities Exchange Act. E.g., Sherry v. Diercks, 628 P.2d 1336, 1339 (Wash. App. 1981); see also 69 Am. Jur. 2d Securities Regulation—Federal § 954. This exception is based in part on the fact that an anticipated defense based on the Securities Exchange Act will not support federal subject matter jurisdiction. 69 Am. Jur. 2d Securities Regulation—Federal § 954. In this case, Bank brought two state law claims that would not, in and of themselves, have supported federal jurisdiction. The fact that Borrower has raised a defense that invokes federal jurisdiction does not affect this court's jurisdiction over the case or its ability to adjudicate the claim.

Borrower's claim that her loan agreement with Bank is illegal and void is based on Bank's alleged violations of federal statutes and regulations governing what are known as margin or purpose loans. 12 CFR

part 221 (known as Regulation U); see generally Annot., <u>What Constitutes Violation of Margin Requirements for Banks under § 7 of Securities Exchange Act of 1934 (15 U.A.C.A. § 78g) and Regulation U Promulgated Thereunder (12 CFR §§ 221.1 et Seq.)</u>, 34 A.L.R. Fed. 32, at § 2 (1977, Supp. 2004). These statutes apply only in narrow circumstances. Specifically, Regulation U applies if and only if the "bank loans [were] collateralized by stock where the proceeds are used for the purpose of purchasing or carrying margin securities . . . .'"<u>People's Nat. Bank of New Jersey v. Fowler</u>, 372 A.2d 1096, 1101 n.5 (N.J. 1977) (citing 12 CFR § 221.1(a)). Margin securities or margin stocks are defined as any equity security that is a stock registered on a national securities exchange. 12 CFR § 221.3(v). Such loans are required by statute not to exceed the maximum loan value of the collateral. 15 U.S.C. § 78g. Presently, that maximum value is 50% of the stock's current market value at the time of the loan. 12 CFR § 221.4. The main purpose of these regulations is to control stock market speculation and regulate by limiting the amount that banks can loan based on stock collateral that is used to leverage itself or further stock purchases. <u>Fowler</u>, 372 A.2d at 1100–01. It was not, as Borrower infers, to protect borrower–investors. <u>Stonehill v. Security Nat. Bank</u>, 68 F.R.D. 24, 31 (S.D.N.Y. 1975).

Before the court can examine the substance of Borrower's defense, there is a final threshold question concerning Borrower's right to raise Regulation U as a defense and whether she has a private right of action. The question is one of apparent first impression for the Vermont courts, but there is a great deal of guidance from the Second Circuit and the neighboring jurisdiction of New York. Traditionally, federal courts found an implied right of action in § 7 of the Securities Exchange Act of 1934. See generally Annot., <u>Civil Liability of Banks for Violation of Margin Requirements of § 7 of Securities Exchange Act of 1934 (15 U.S.C.A. §</u>

78g) and Regulation U Promulgated Thereunder (12 Cfr §§ 221.1 et Seq.), 34 A.L.R. Fed. 542 (1977, Supp. 2004) (collecting implied right cases). In the 1980s, this approach shifted and reversed as the United States Supreme Court tightened the guidelines to determine the existence of an implied private right of action and Congress amended the Securities Exchange Act to make borrowers as well as banks liable for margin violations under Regulation X. The leading case under this revised approach comes from the Second Circuit Court of Appeals. Bennett v United States Trust Co. of New York, 770 F2d 308, 311–13 (2d Cir. 1985). The legal effect of Bennett was a metaphorical opening of the gates as cases began to pour in restricting the right of borrowers to bring private actions under § 7. Berliner Handels–Und Frankfurter Bank, New York Branch v. Coppola, 626 N.Y.S. 2d 188, 189 (N.Y. App. Div. 1995); Banque Indosuez v. Pandeff, 603 N.Y.S.2d 300, 303 (N.Y. App. Div. 1995) (collecting cases from federal circuits). The Banque court even went as far as to say: "In accordance with the unanimous view of the Federal circuit courts that have considered the issue, defendant lacks the standing to assert such a claim since section 7 (15 U.S.C. § 78g) does not afford a private right of action for a violation of the margin rules." Id. Commentators have similarly picked up the drum beat of Bennett. See, e.g., R. Karmel, Mutual Funds, Pension Funds, Hedge Funds and Stockmarket Volatility—What Regulation by the Securities and Exchange Commission Is Appropriate?, 80 Notre Dame L. Rev. 909, 937–38 (2005) (noting that since 1984 even the Federal Reserve Board has moved away from enforcing margin rates); B. Black & J. Gross, Making It Up As They Go Along: The Role of Law in Securities Arbitration, 23 Cardozo L. Rev. 991, 1041 (2002) ("Accordingly, it has long been settled that a customer has no private right of action for damages if the broker permits the account to be out of compliance with the margin regulations.").

What is perhaps the most persuasive about <u>Bennett</u> is that even when courts disagree with its direct holdings, they have still applied its underlying rationale to find that borrowers lack a private right of action under § 7. See, e.g., <u>Cohen v. Citibank, N.A.</u>, 954 F. Supp. 621, 626 n.3 (S.D.N.Y. 1996) (distinguishing plaintiff's case brought under § 29b of the Securities Exchange Act from the holding of <u>Bennett</u>). As the court in <u>Cohen</u> reasoned,

> [I]n order to establish a violation under Section 29(b), a plaintiff must "show that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the [1934] Act was designed to protect."
> . . . Additionally, plaintiff, an individual borrower, is not in the class of persons the 1934 Act was designed to protect and thus fails to meet the third prong necessary to assert her Section 29(b) claim. See <u>Bassler [v. Central National Bank</u>, 715 F.2d 308,] 310–11 [(7th Cir.1983)] (finding that the overriding purpose of margin regulations is not to protect any individual, but to safeguard the integrity of the markets and the nation's financial health) (holding that Congress did not intend "to confer a right of action upon investment borrowers as against investment lenders."); <u>Bennett</u>, 770 F.2d at 312 ("Section 7 was clearly not passed for the especial benefit of individual investors.") Accordingly, plaintiff's first claim is dismissed.

954 F. Supp. at 626. Since <u>Bennett</u> and its line of cases, no court has held that a private right of action exists under § 7 or its brethren. Given this fact and more importantly the fundamental reasoning this shift represents, Borrower simply does not have a private right of action under Regulation U. Therefore, her defense of illegality and void agreement is unenforceable as a matter of law.

As this argument was Borrower's only defense to Bank's motion for

summary judgment on the issue of liability, summary judgment is appropriate in Bank's favor. Borrower has not produced any further evidence that disproves or modifies her liability on the promissory note. Notwithstanding this conclusion, the question of damages remains in dispute and, depending on the merits and validity of Borrower's counterclaims, the question of whether Borrower will owe Bank or vice versa in a final reckoning remains a live issue. For the meantime, Bank is entitled to summary judgment as a matter of law on the issue of liability on the promissory note.

## Promissory Estoppel

Bank seeks to eliminate Borrower's next claim of promissory estoppel based on the existence of several agreements that define the relationship and establish the duties and liabilities of each. To the extent that there are valid agreements governing the relationship, promissory estoppel is inappropriate. LoPresti v. Rutland Reg'l Health Servs., 2004 VT 105, ¶ 47. Borrower argues that this claim is merely an alternative theory of recovery if the court should find any or all of the agreements void as a matter of law. As Borrower's defense of illegality and void agreement based on Regulation U fails as a matter of law, Bank is entitled to summary judgment in its favor on this issue as well. Since there is a valid agreement between the parties, promissory estoppel is inappropriate.

## Fraudulent Misrepresentation

Bank moves for summary judgment on Borrower's fraudulent misrepresentation claims. These claims are based on the statements made by Stratevest employees to Borrower during the 2000–01 period when they

were soliciting her business. Borrower now claims that in light of their failure to maintain the value of her account, these statements amount to misrepresentation's of Stratevest's ability, services, and expertise. The court will look at each standard separately and then at the consumer fraud ramifications of each.

The standard for fraudulent (intentional) misrepresentation is:

> An action for fraud and deceit will lie upon an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage.

Union Bank v. Jones, 138 Vt. 115, 121 (1980), quoted in Silva v. Stevens, 156 Vt. 94, 102 (1991). None of the facts in this case show that Stratevest or its employees made intentionally false statements to Borrower during the solicitation phase of their relationship.

The evidence shows that Stratevest worked very hard to get Borrower to move her assets to Stratevest. The company through its employees made statements to her that 1) spoke of the quality of Stratevest's services and 2) its intent to help Borrower increase her assets. The bulk of these statements are generic and promise nothing specific. The subsequent evidence does not show an intent on Stratevest's part to mislead Borrower about the nature of their investment services. In this sense, they simply do not fit the definition of fraudulent misrepresentation. Silva, 156 Vt. at 103 ("Fraudulent [misrepresentation] involves concealment of facts by one with knowledge, or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud."); see also Repucci v. Lake

<u>Champagne Campground, Inc.</u>, 251 F. Supp. 2d 1235, 1238–39 (D.Vt. 2002).

None of the facts suggest that Stratevest wrongly presented itself as an investment firm who in reality knew that it was not capable of providing such services to Borrower. Stratevest offered to work in Borrower's best interest, and there is no evidence that it failed to do so in its investment planning work. Likewise, Stratevest's employees statements about their expertise did not allege anything that they were not. That is the statements did not portray the employees as having licenses, special certifications, or any particular qualification that they did not actually have. Cf. <u>Marbury Management, Inc. v. Kohn</u>, 629 F.2d 705, 707, 710 (2d Cir. 1980) (affirming in general language the lower court's imposition of liability on an employee who represented himself as a fully licensed and registered representative of a brokerage house when in fact he was a trainee unauthorized to act); see also <u>Hoffman v. TD Waterhouse Investor Services, Inc.</u>, 148 F. Supp. 2d 289, 291 n.3 (S.D.N.Y. 2001) (noting that any broader interpretation of <u>Marbury</u> is misleading as it must be read within the context of federal rule 10-b claims of value); <u>Laub v. Faessel</u>, 745 N.Y.S.2d 534, 537 (N.Y. App. Div. 2002) (noting that reliance on <u>Marbury</u>'s general liability language is misplaced in common law fraud claims).

The Stratevest employees used only general terminology to describe themselves and their services: "your professional money manager;" "loan professional;" and a "one-stop set of professionals and experts to insure your financial needs are met and exceeded." Borrower's argument is that these statements are necessarily false because her expert says that the employees actions and knowledge fall below the standard for experts. But

this is not enough for fraudulent misrepresentation as it goes to the performance of the employees and not their status. Stratevest and its employees did not represent themselves or their services as something they were not. While Borrower may be disappointed in the difference between Stratevest's promise and its latter performance, there is no intentional misrepresentation that rises to an actionable level. What is particularly damning to Borrower's fraudulent misrepresentation claim is that much of the losses she alleges to have sustained came from later fluctuations in Nortel stock prices. These were facts unknowable to either party when they made their agreements in 2001. Therefore, Bank is entitled to summary judgment on Borrower's fraudulent misrepresentation claims.

## Negligent Misrepresentation

One question that lingers unanswered in Borrower's complaint is what service Stratevest provided instead of what it promised. Borrower's central complaint against Bank and Stratevest is that they mismanaged the portfolio to debt relationship by choosing not to sell or convert more of Borrower's Nortel shares in June 2001. Nowhere in the facts does Borrower show evidence that Stratevest failed to monitor Nortel's stock position or provide a quantifiably substandard investment service that would qualify as a different service than the one promised. To be perfectly clear, Stratevest promised Borrower an investment management program that would monitor the Nortel stock and the rest of her portfolio. From the available evidence, that is exactly what Stratevest did. Moreover, the distinction that Borrower sets up between a promised service and the performance of that service confuses contractual obligations with factual representations. Howard v. Usiak, 172 Vt. 227, 231–32 (2001). As with the Howard case, Borrower's theory in this area is so broad as to subsume

any contractual relationship where a customer does not receive the exact service that she was promised into the realm of negligent misrepresentation and consumer fraud.

Borrower's further claims concerning Stratevest's "representations" and "inducements" fail to make out a case for negligent misrepresentation. Vermont has adopted the Restatement (Second) of Torts's definition of negligent misrepresentation. Hedges v. Durrance, 2003 VT 63, ¶ 10 (mem.). This definition states that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1). The key word in this definition is "information." All of the alleged misrepresentations that Borrower points out in her brief are either broad statements of "expertise" or promises to provide future services. As with fraudulent misrepresentation, Borrower conflates future performance with these past statements. The evidence does not show that Bank or Stratevest knew or should have known that Borrower's investments would continue to fail when they promised to care for her investments. While Borrower's evidence creates an inference that Stratevest should have chosen differently, that goes to the quality of Stratevest's service. It does not show that Stratevest misrepresented its general services as investment and loan providers.

Stratevest's statements do not create an inference that Stratevest

guaranteed a particular outcome to Borrower.  Broad statements such as "[we] will insure that your financial needs are met and exceeded" do not create a responsibility to guarantee outcomes when both parties know that the investments at stake are subject to fluctuations and contingencies. Opinions can be considered "information" under § 552 but only in limited circumstances where an expert is making a reasoned and intelligent judgment on a set of discrete facts.  Restatement (Second) of Torts § 552 cmt. e (noting that opinions considered "information" must be based on expert knowledge and careful consideration of the underlying facts); see also Howard, 171 Vt. at 232 n. 1 ("Even if plaintiff could base a negligent misrepresentation claim on a showing that defendant had no intention of fulfilling a promise to perform, he cannot establish defendant's intent solely by proof of nonperformance of the promise.").  Thus, Borrower's negligent representation claims must fail for lack of any "information" upon which Stratevest or Bank could have made misrepresentations.

Notwithstanding these shortcomings, there is a kernel to Borrower's negligent misrepresentation argument in the question of what service Stratevest had to offer for margin loan financing.  Borrower claims that Stratevest left much of the loan-to-value planning to employees of the Bank who merely monitored her loan for the Bank and did not participate in her financial planning.[2]  In this respect, Borrower raises an issue of material

---

[2] Borrower's evidence shows that Stratevest employees Sandy Kidwell and Matthew Malaney lacked even a basic understanding of loan-to-value calculations or its relevance to Borrower's account.  As a corporate partner of Bank, Stratevest appears for the purpose of summary judgment to have been a servant of two masters.  In contrast to Borrower's previous relationship with Merrill Lynch where all services went through one office and a single employee

fact. Stratevest may have behaved as it promised on the investment end of its business, but its alleged lack of knowledge about loan-to-value ratios and expertise in monitoring and planning for these contingencies create an issue about their ability to provide Borrower with complete financial planning and "expert" advice in this area. If Stratevest induced Borrower to move her assets based, at least in part, on their ability to manage her assets and if part of that management included balancing her margin loans, which were secured by her investments, then there is a material question whether Stratevest was truly qualified and an "expert" in this area as they portrayed themselves to be. Limoge v. People's Trust Co., 168 Vt. 265, 267–68 (1998).

What distinguishes this claim of misrepresentation from Borrower's previous claims is that rather than being based on a promise of future performance, the misrepresentation is a specific service that Stratevest did not allegedly provide. According to Borrower, Stratevest knew or should have known that Borrower's portfolio included a rather large line of credit and would require sophisticated loan-to-value management. This, she argues, is a part of a competent, comprehensive investment management program. Stratevest's failure to provide this to her, presumably as Merrill Lynch had done, represents a misrepresentation of what Stratevest offered. Stratevest counters with evidence that it provided the type of loan-to-value service required of it required, but this merely disputes, rather than refutes, Borrower's evidence. This makes summary judgment inappropriate on the

who dealt with Borrower, Stratevest and Bank were originally bifurcated entities with multiple employees who each carried only specific knowledge of their area. Thus instead of providing sophisticated loan management, Bank and Stratevest appear to have provided services that may have belied Stratevest's initial description.

issue of negligent misrepresentation for this specific question.

## Consumer Fraud

Borrower makes two separate claims for consumer fraud based on representations and inducements that she claims Stratevest and its employees made that caused her to move her assets from Merrill Lynch. The first claim of consumer fraud is based on what Borrower alleges is the difference between the services Stratevest promised and what it actually provided. In her complaint, Borrower claims that Stratevest through its employees promised to "relieve [Borrower] of the day to day concern over the movement of Nortel" and "actively monitor and act on Nortel positions." Borrower argues that these "promises" were not bona fide in the sense that they described a quality of service that she did not receive. This argument is founded upon the Vermont Attorney General's Rule CF 103, which was promulgated to further define unfair acts and deceptive practices. 9 V.S.A. § 2453(c).

Rule CF 103 reads in its relevant section:

(a) A solicitation is not bona fide when the seller or solicitor uses a statement or illustration in any advertisement which would create in the mind of a reasonable consumer a false impression of the grade, quality, quantity, make, value, model year, size, color, usability or origin of the goods or services offered or which otherwise misrepresents the goods or services in such a manner that, on subsequent disclosure or discovery of the true facts, the consumer may be switched from the advertised goods or services to other goods or services.

This describes the practice known as "bait and switch" where one type of

good or service is promised and a lesser equivalent is delivered. E.g., Winey v. William E. Dailey, Inc., 161 Vt. 129, 136 (1993) (describing "the classic bait-and-switch technique by which a seller induces consumer interest with an attractive offer and switches to other merchandise or terms, considerably less advantageous to the consumer."). Here, as in the fraudulent misrepresentation analysis, the facts do not show such a "bait and switch" situation. Stratevest offered investor services, and it provided investor services. Notwithstanding Borrower's surviving claim of negligent misrepresentation on the loan-to-value service, Stratevest did not offer Borrower a general investment service that differed fundamentally from what it eventually delivered. See Winey, 161 Vt. at 136–37 (noting that 9 V.S.A. § 2457 should be read narrowly in analyzing contract formation). Therefore, Bank is entitled to summary judgment on Borrower's "bait and switch" consumer fraud claims.

The sole remaining claim mirrors Borrower's negligent representation argument. That is, she argues that Stratevest's self-described full service investment management did not include long-term, competent loan-to-value management. As with the misrepresentation arguments, the difference between this claim and the "bait and switch" arguments are critical. Unlike the other, more generalized claims, the argument here is cogent and raises issues of material fact. Bank characterizes Stratevest's services as satisfying its promises. It says that its March and June sales of Borrower's stock were required by the terms of the loan and the plunging market. But Borrower's expert and other evidence suggest that the terms of Bank's loan and the coordination with the investment decisions failed to meet the level of investment strategy and long-term planning that Stratevest used (and uses) to characterize its service, which initially induced Borrower to shift her assets to Stratevest.

As the court has noted, Borrower's characterizations do suggest a negligent misrepresentations. These alleged misrepresentations, if proven true, rise to the level of consumer fraud violations. 9 V.S.A. § 2453; <u>Silva</u>, 156 Vt. at 102. There is a reasonable inference that Stratevest knew or should have known that a normal brokerage house would be able to offer different services—taking a more long-term view on a margin loan or planning for further stock share growth in its plans to sell or retain it—than what it could and that the investor would have no way of knowing this. Stratevest, by its bifurcated nature, could only offer a bank/investment hybrid that may have had more restrictive features and less cooperation. If so, then this and this alone represents a consumer fraud violation. Stratevest may have made negligent misrepresentations about its loan and investment services, which induced Borrower to switch her assets and lose them in the process. Summary judgment on this particular claim is inappropriate at this time.

Fiduciary Duty Before 2001

Borrower argues that Stratevest had a fiduciary duty to her based on their 1998 custody account agreement. She bases this argument on 1) the agreement she had with Stratevest; 2) the informal counsel and advice Stratevest employees gave her; 3) the fact that her sister worked for Stratevest; and 4) her reliance on the informal advice. The facts at this point in the case and show a clear picture of what the parties relationship was prior to 2001 and what actions either side made. In this respect, the record demonstrates that this issue is ripe for summary judgment. Cf. <u>Ascension Tech. Corp. v. McDonald Invs., Inc.</u>, 327 F. Supp. 2d 271, 277 (D.Vt. 2003) (refusing summary judgment where the nature and details of the parties relationship had not been developed for the purpose of

establishing or disproving a fiduciary duty).

The evidence is that the 1998 agreement with Stratevest was limited to the custody account and was non-discretionary. This meant that the firm exercised only limited control over Borrower's investments and provided no formal planning or maintenance. Borrower remained in charge of her investments, and Stratevest was bound to seek her approval for all transactions. The intent of the relationship was to allow Stratevest to hold the stock shares but not to give it power or discretion over those assets—in sharp contrast to the parties relationship under the 2001 agreements. This relationship does not in and of itself create any additional fiduciary duty beyond the terms of the agreement. See McGee v. Vermont Fed. Bank, FSB, 169 Vt. 529, 530 (1999) (mem.) (suggesting that a fiduciary relationship is dependent upon a party actively cultivating reliance in the other).

Rather, Borrower's central argument on this issue is about the informal advice Stratevest gave her during this time and how much she claims to have relied on it. Stratevest's advice to Borrower began with standard investment recommendations that were given as part of the firm's communication with client when it sought her approval for stock transactions. This advice changed as Stratevest employees and Borrower got to know one another and Borrower lost her broker at Merrill Lynch. The advice at this point breaks down into two categories: advice from the employee to Borrower about present investment decisions and suggestions about how Stratevest could serve Borrower's over-all needs better if Borrower shifted her portfolio over. The first, while it may at times have exceeded the literal terms of Borrower's 1998 agreement, does not rise above the level of a normal investor–client relationship. The facts do show

Borrower's growing reliance on the firm as investment advisors, but this relationship did not generate any excessive reliance or alter the relationship such that an additional fiduciary duty arose. McGee, 169 Vt. at 530 (noting that a fiduciary duty requires the relationship "to ripen into one in which the [clients] were dependent on, and reposed trust and confidence in, the Bank in the conduct of its affairs."). When the relationship did alter, the parties drew up a new agreement that expanded Stratevest's responsibility and vest greater power in them. Thus, as a matter of law, Stratevest had no particular fiduciary duty stemming from its 1998 agreement with Borrower.

## Fiduciary Duty After 2001and an Implied Duty of Care

Borrower's claims for a breach of fiduciary duty is based on her 2001 agreements with Stratevest. Under these agreements, the parties established a discretionary account that vested greater power and discretion in the hands of Stratevest. Borrower now claims that these obligations amounted to a fiduciary duty that Stratevest breached when it failed to take reasonable care of her investments, which caused their loss. This argument is a question of duty and breach under the parties' contract and does not establish a separate claim. Breslauer v. Fayston Sch. Dist., 163 Vt. 416, 422 (1995). Borrower is free to argue that her 2001 agreements must be interpreted in such a way that they vested in Stratevest a high duty of care towards Borrower's investments, but this does not create a separate claim; it remains a breach of contract issue. Id. As such, Borrower's claim must be dismissed as repetitive and a part of her breach of contract claim.

## Implied Duty of Care

Along with every contract there is an implied duty to perform "with

care, skill, reasonable expedience and faithfulness." <u>S. Burlington Sch.</u> <u>Dist. v. Calcanei-Frazier-Zajchowski</u>, 138 Vt. 33, 44 (1980). This is not a tort claim but another breach of contract claim similar to the breach of good faith and fair dealing. These claims are allowable as separate contract claims so long as the facts support their existence. In support of this claim, Borrower's evidence shows that Stratevest may not have properly communicated with Borrower at critical points in their relationship or have made proper long-term decisions about stock investment and diversification. To the extent that these claims demonstrate an alleged failure by Stratevest to perform its investment monitoring duties under the 2001 agreements with care and skill, summary judgment is inappropriate for this claim.

<h2 style="text-align:center">9A V.S.A. § 9–207</h2>

Borrower's next counterclaim is that Bank had a duty to preserve the value of her Nortel stock under the U.C.C. provisions for secured transactions, specifically § 9–207. Bank challenges this claim on the basis that the purpose and provisions of § 9–207 do not create a general duty in the secured party to maintain the exact value of a volatile collateral. For the purposes of this claim, Bank's status would be as a secured party. 9A V.S.A. § 9–102(a)(75). Borrower's argument relies upon language in the section that reads: "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession. In the case of chattel paper or an instrument, reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed." 9A V.S.A. § 9–207(a).

As the official comment to § 9–207 notes this obligation comes from

an older common law duty of care.  9A V.S.A. § 9–207, cmt. 2.  The comment cites to §§ 17 and 18 of the Restatement, Security for further definition.  Id.  The first of these two sections refers strictly to maintenance of physical care over chattel such as a horse or a piece of jewelry.  Restatement, Security § 17, cmt. a.  As such it is inapposite in the present case.  The second, § 18, has been held to apply to stock and other equity investments.  E.g., Layne v. Bank One, Ky., N.A., 395 F.3d 271, 276 (6th Cir. 2005).  Like § 17 though, § 18 is limited in its scope of application.  The comment to the section notes that the secured party "is not liable for a decline in the value of pledged instruments, even if timely action could have prevented such decline."  Restatement, Security § 18, cmt. a.

        As such, several courts have held that § 9–207 does not create a duty of care for secured parties that holds them responsible for a decline in market value of securities.  E.g., Layne, 395 F.3d at 276–77 (collecting cases); Solfanelli v. Corestates Bank, N.A., 203 F.3d 197, 201 (3d Cir. 2000).  There are exceptions to this, according to the nature of individual agreements.  Layne notes that some courts have held secured parties liable under § 9–207 where the securities held were convertible debentures (a bond or instrument that the holder may change into some other security).  Layne, 395 F.3d at 277 n.7.  But in each of those cases, the duty attached because "the losses occasioned by the secured creditor's failure to convert the debentures were clearly foreseeable, because the creditors had specific knowledge of an event that would materially affect the value of the securities."  Id. (quoting approvingly from the lower court opinion).

        In a similar vein, Borrower cites to a class of case that hold a secured party responsible for losses under § 9–207 when a loan is over-collateralized an Borrower requests that the collateral be redeemed.  Id. at

278–79; <u>Solfanelli</u>, 203 F.3d at 201.  The leading case that Borrower cites is <u>FDIC v. Caliendo</u>.  802 F.Supp. 575, 583–84 (D.N.H.1992).  In that case, the court found that the lender might have had a duty to protect the value of stock shares so long as the original value exceeded the amount of the loan and the borrower had requested liquidation.  <u>Id</u>. at 584.  The court emphasized the need to establish over-collateralization and the request for liquidation as a necessary precursors to any § 9–207 duty.  <u>Id</u>.  ("Whether the loan is over-collateralized is a genuine issue of material fact that must be known with complete certainty before the court may impose the duty to preserve the value of collateral upon the plaintiff FDIC.");  <u>Solfnelli</u>, 203 F.3d at 201 (emphasizing the need for the borrower to request redeemption).

While the facts of this case arguably show—at least for the purposes of summary judgment—that Borrower's collateral securities may have exceeded the value of her loan at the time the line of credit was extended, they also show quite clearly that Borrower did not request liquidation.  Borrower brushes over this element in her argument by arguing that she put her total faith in the judgment of Stratevest, but this does not satisfy the critical feature of the <u>Caliendo</u> exception.  As the court in that case noted, its imposition of this duty was a balanced result of fairness and equity.  802 F. Supp. at 585.  The court applied the exception because of the nature of the collateral, specifically that the original value of the collateral exceeded the value of loan.  <u>Id</u>. at 583.  This meant that some of the collateral did not belong to the lender, and the lender had a duty to protect this excess so long as it was within its control and the lender made his interests clearly known.  <u>Id</u>.

<u>Caliendo</u> speaks of a "hesitant[cy] to place the [secured party] in the

position of an investment advisor or insurer of the securities pledged." Id. It only does so because the lender holding the excess collateral is controlling something beyond the scope of its right under article 9. It must, therefore, consider the rights of the borrower in its decisions and monitoring of the collateral so that the borrower's rights are preserved. Without this additional right, the borrower's interest is no greater than the lender's, and their right to the collateral is equal. In such a situation, § 9–207 will not impose additional duties on the lender. While Stratevest may have been Borrower's investment advisor, Bank was her lender and § 9–207 attaches only to the latter. By ignoring this necessary portion of the exception, Borrower is essentially arguing to expand § 9–207 to apply beyond the realm of secured transactions and into their relationship between Bank and Borrower as investment advisor and advisee. This is a very different argument than Caliendo and is not supported by any legal precedent.

Moreover, this argument confuses the status of the parties under a § 9–207 claim. As a secured party, Bank did not have inherent investment advisory duties—those were separate contractual obligations and should not be considered when evaluating its duties as a secured party under article 9. Instead, it had access to the stock shares as secured collateral to a loan and a limited duty to care for the stocks that had more to do with keeping physical control than maintaining value. Section 9–207 does not create an inherent duties in a secured party to monitor the value of securities or similar volatile collateral. It does not go to relationships that a borrower and lender may have outside the secured transaction. In Caliendo-type situations, the secured party has a duty to protect value, but this is due to the nature of the collateral and the rights that attach to it. Caliendo, 802 F. Supp. at 583 (discussing the reasoning of Fidelity Bank & Trust Co. v.

Production Metals Corp., 366 F.Supp. 613 (E.D.Pa.1973)).  That is not the case here and Borrowers arguments provide no compelling reason to expand the law beyond it.

Finally, Borrower's argument is not really about Bank's care, or lack thereof, of the Nortel shares, but Stratevests' failure to properly maintain her account so that her overall stock shares (and their potential for future income) were not completely sacrificed for a hasty sale.  This has nothing to do with the Bank's role and duty as a secured lender under article 9 of the UCC.  Rather it appears to be a restatement of Borrower's more straightforward contract and fiduciary claims.  Therefore, Borrower's counterclaim under 9A V.S.A. § 9–207 is dismissed.

Based on the foregoing, Plaintiff Bank's motion for summary judgment is Granted in part and Denied in part.

Dated at Burlington, Vermont_____, 2005.


_____
Richard W. Norton, Judge